Freightliner, L.L.C., appeals from a judgment based on a jury verdict awarding Whatley Contract Carriers, L.L.C. ("WCC"), $440,000 in compensatory damages and $750,000 in punitive damages on WCC's suppression claim. We reverse *Page 885 
and remand for the entry of a judgment as a matter of law in favor of Freightliner.
 Background
This action concerns the performance of 40 long-haul trucks manufactured for WCC by Freightliner. Freightliner has manufacturing plants in Portland, Oregon; Mt. Holly, North Carolina; Cleveland, Tennessee; and Santiago, Mexico. Freightliner of Southern Alabama is a Freightliner dealership located in Montgomery.
WCC, now out of business, was a commercial long-haul trucking company.[1] WCC hauled goods into 48 states. Joseph Whatley, the managing member of WCC, has extensive experience in the trucking industry; Whatley has been involved in the trucking industry since he was a child. Whatley's father owned a truck stop, operated a business engaged in manufacturing tractor-trailers, and operated a long-haul trucking business. Upon graduating from college in 1975, Whatley started his own trucking business. He started his business with five trucks, and by the mid-1990s Whatley's business owned 150 trucks. According to Whatley, he was "always buying trucks and always buying trailers." WCC went out of business in 2001.
In January and February 1999, WCC purchased 40 trucks from Freightliner of Southern Alabama. Freightliner manufactured those 40 trucks at its plant in Mexico and had the trucks delivered to WCC in Alabama. Immediately upon delivery of the trucks, Whatley complained of problems with the trucks. He alleged that they experienced constant breakdowns and had numerous manufacturing defects to the point that the trucks could not be used as intended. Whatley also claimed that Freightliner and Freightliner of Southern Alabama suppressed material information from him and from WCC regarding the deficiencies in the production quality at Freightliner's Mexico plant, which, Whatley and WCC alleged, Freightliner and Freightliner of Southern Alabama knew of and had a duty to disclose.
On February 16, 2001, Whatley and WCC sued Freightliner and Freightliner of Southern Alabama, alleging misrepresentation, suppression, breach of contract, breach of express and implied warranties, negligence and/or wantonness, and negligent and/or wanton training and supervision. Freightliner denied Whatley and WCC's claims; Freightliner of Southern Alabama also denied those claims and asserted a counterclaim against WCC seeking $39,537.02 in damages on its claims of breach of contract, unjust enrichment, and open account.
The trial court entered summary judgments in favor of Freightliner and Freightliner of Southern Alabama as to all of WCC's claims except the suppression and breach-of-implied-warranty claims. The trial court also dismissed the claims asserted by Whatley in his personal capacity.
Freightliner and Freightliner of Southern Alabama also moved for judgments as a matter of law on the suppression claim and the breach-of-implied-warranty claim. In their motion they asserted, among other things, that Freightliner had no duty to disclose to WCC any latent defects in the trucks; that WCC failed to produce evidence indicating that Freightliner had suppressed *Page 886 
any alleged defects; that Whatley made no specific and direct inquiry on behalf of WCC for information regarding alleged defects and, thus, no duty to disclose in this commercial transaction arose; that a request for information about a product's future performance is generally considered a solicitation of an opinion and a response to such a request is considered an opinion rather than a statement of fact and a statement of opinion cannot form the basis of a suppression claim; and that WCC's suppression claim was barred by the statute of limitations. The trial court denied this motion.
WCC's claims of suppression and breach of implied warranty and the counterclaim asserted by Freightliner of Southern Alabama against WCC were tried before a jury. The following facts, which we find relevant to this opinion, emerged from the evidence presented at trial.
In July 1998, Whatley, on behalf of WCC, sought to purchase 69 "FLD 120" trucks from Freightliner of Southern Alabama.[2]
Freightliner had 4 trucks that it said it could deliver to WCC within a month. Because Freightliner had not yet produced the 65 remaining trucks and could not produce them for some time, it could not commit to deliver the next 40 of the trucks until July 1999 — approximately a year from the date Whatley placed the order. Freightliner could not specify a delivery date for the remaining 25 trucks.[3] However, WCC needed the trucks sooner if possible. Whatley and the local dealership discussed the possibility of having Freightliner deliver the lot of 40 trucks earlier than July 1999.
In August or September 1998, Steve Murphy, the general manager of Freightliner of Southern Alabama, telephoned Whatley regarding the delivery of the 40 trucks. Whatley summarized this conversation as follows:
 "Steve [Murphy] told me that he thought he had found a way to get the [40] trucks quicker for me and that he knew I needed them quickly. I asked him how he had done that. He said, `Well, would you take Mexican trucks if that would speed them up getting them to you?' I said, `Well, why wouldn't I, Steve? You know, you know how bad I needed them.' He said, `Well, I think we have found a way to get the trucks for you quicker. Are you okay with Mexican trucks?' I said `Aren't they the same specs that I have got?' `Yes,' he answered. I said, `Well, aren't they the same specs that we talked about?' And again he says, `You know, yeah, they are.' They are the same trucks.' I said, `Well, why wouldn't I want them from there?' He said, `I just wanted to check with you. Let me see what I can do and I will be back in touch with you.'"
Whatley stated that he had another telephone conversation with Murphy a few days after this conversation. Murphy added to this second telephone conversation an unidentified man from the Freightliner office in Portland who was in charge of scheduling, and Whatley discussed with this man potential delivery dates for the 40 trucks that would be manufactured in *Page 887 
Mexico. According to Whatley, the unidentified man from Portland hung up the telephone and Whatley and Murphy continued to talk. According to Whatley, Murphy told him the Mexico plant was a new plant for Freightliner. Whatley testified:
 "He [Murphy] again says, `You know, are you okay with this? You know, we are doing this and doing all we can because we know you need the trucks so fast and want to try to get them to you.' I thanked him for that. Then he says, `Now, you're okay taking the Mexican trucks?' And again I said, `You know, Steve, I don't see any difference. It's my engines, my transmissions, my rear ends, my oil seals, my fan hubs, everything that I expected on them. And I just don't see any difference in them.' He said, `Well, there is not, Freightliner is Freightliner,' or something to that — that's not verbatim, but a comment to that degree. And that was it."
A week or two after this second conversation, Whatley met with Murphy and with Frank Hawkins, a Freightliner representative. During this meeting, Whatley, Murphy, and Hawkins discussed WCC's truck order and confirmed that Freightliner's Mexico plant would manufacture 40 trucks for WCC during January 1999. Also during this meeting, Whatley told Murphy and Hawkins that he had been unaware that Freightliner even had a plant in Mexico until his telephone conversation with Murphy. Murphy or Hawkins responded that the Mexico plant was a former Mercedes-Benz brand automobile plant that was now building Freightliner trucks. Whatley admitted at trial that he did not specifically ask during these conversation about the quality of the Freightliner products manufactured in Mexico. However, in later testimony, he claimed that he asked 6 to 12 times if there were any differences between Freightliner's American-produced trucks and Freightliner's Mexican-produced trucks. Whatley did not identify when and with whom these conversations regarding the quality of the trucks manufactured in Mexico occurred.
In late January 1999, Freightliner began delivering to WCC the trucks produced in its Mexico plant. By February 15, 1999, Freightliner had delivered 28 of the 40 trucks to WCC. The remaining 12 trucks were delivered shortly thereafter. Each truck delivered to WCC was covered by a written warranty, which provided, in part:
"Purchaser's Exclusive Remedy
 The foregoing limited warranty shall be the Purchaser's sole and exclusive remedy against Freightliner whether in contract, under statute (including statutory provisions as to conditions as to quality or fitness for any particular purpose of goods supplied pursuant to the contract of sale), warranty, tort, strict liability or any other legal theory.
"Limitation on Liability
 Freightliner's liability to a Purchaser on any claim for loss or damage arising out of, connected with, or resulting from the contract for sale or the performance or breach thereof, or from design, manufacture, sale, delivery, service, repair or use of any vehicle manufactured by Freightliner shall not exceed the price to Purchaser allocated to the part of such vehicle which gives rise to the claim, and in no event shall Freightliner be liable for special or consequential damages including but not limited to, injuries to person or damage to property, loss of profits or anticipated profits, or loss of vehicle use."[4] *Page 888 
Whatley acknowledged that the trucks Freightliner delivered to him met the specifications he had given Freightliner when he ordered the trucks.
According to Whatley, the 40 trucks delivered to WCC had significant problems. Whatley claimed that the trucks constantly broke down, that the optimized-idle feature did not work, and that the trucks had problems with the brakes, the shocks/suspension system, the alignment, and other features. Whatley testified that he became aware of the problems upon the delivery of the first of the 40 trucks and that he was continually aware of problems as the trucks were delivered in January and February 1999. He also testified that, after delivery of the first 10 Freightliner trucks manufactured at the Mexico plant, he no longer trusted Freightliner's employees or his own mechanics to conduct the pre-delivery inspection on the Freightliner trucks. Because of the number of problems WCC experienced with the first 10 trucks, Whatley insisted on performing the pre-delivery inspections on the remaining 30 trucks himself before he would authorize payment to Freightliner for those trucks. Based on his personal inspections, Whatley accepted those trucks. Whatley acknowledged that whenever he identified a problem, Freightliner of Southern Alabama worked with WCC and corrected it. However, Whatley claimed that even after the initial corrective work was performed, the trucks continued to break down and required repairs and attention.
Whatley claimed that soon after the last of the 40 trucks were delivered, he requested that Freightliner of Southern Alabama provide WCC, at no charge, with extended warranties on the trucks because of the extent of the problems WCC was encountering. Whatley claimed that Freightliner of Southern Alabama refused to provide the extended warranties. Six months later, when it became evident that the problems with the trucks were continuing, Freightliner of Southern Alabama offered WCC the extended warranties. However, Whatley refused the offer, believing at that point that WCC was due more from Freightliner than the extended warranties.
Whatley claimed that because of mechanical problems, the trucks manufactured in Mexico were unable to take loads as often as WCC's other trucks and caused the drivers to lose time when they were on the road. In 2001, WCC ceased doing business as a result of Whatley's poor health. Whatley sold 38 of the 40 1999 FLD 120 trucks — the Freightliner models manufactured in Mexico — for $18,000 each.[5] At that time, each of the Freightliner trucks manufactured in Mexico had more than 500,000 miles on it.[6] Whatley claimed that he was able to sell his other 1999 model trucks with similar specifications and mileage for $24,000 to $25,000 each. However, the evidence established that these "other 1999 model trucks" were FLD 132 models, which, according to the record, are substantially different and substantially more expensive than the FLD 120 models.
Evidence was also presented at the trial indicating that the Freightliner plant in Mexico was a former Mercedes-Benz passenger-automobile plant that had been modified to produce Freightliner trucks. The Mexico plant had been producing *Page 889 
Freightliner products since 1992 but had begun producing those Freightliner products for export into the United States in 1998. As was Freightliner's policy, a "mini-audit" was conducted each day on 2% of its daily production to determine the number of "discrepancies" found in the products.[7] Once discrepancies were identified, they were corrected. Each plant sent the results of its mini-audits daily to Freightliner's headquarters in Portland, Oregon. According to Ronald Bush, Freightliner's director of quality control, the results of each plant's mini-audit were not considered public information. Freightliner considered that information to be internal quality indicators for the use only of the production facility at which the mini-audit was performed.
Evidence was introduced indicating that in 1998 the mini-audits conducted at the Mexico plant reflected discrepancies above (sometimes four to five times above) the goal set by Freightliner. In January and February 1999, this discrepancy rate was three times the goal set as desirable by Freightliner. Ronald Bush indicated that in 1999 he discovered that the higher-than-anticipated discrepancies in the Mexico plant resulted from the fact that the Mexico plant used the old Mercedes-Benz passenger-automobile standards in conducting its audits, which were more demanding standards than the commercial-long-haul-truck standards used by other Freightliner plants.[8] Bush also testified that the mini-audit performed in the Mexico plant included a road test, which identified other discrepancies; the other Freightliner plants did not include a road test as part of their mini-audits.
WCC argued that the higher discrepancy rate in the Mexico plant resulted from Freightliner's failure to translate its manufacturing instructions and schematics into Spanish for the Mexican workers and from Freightliner's failure to provide sufficient Spanish-speaking supervisors for its Mexican workers. However, testimony from Freightliner's quality-assurance manager for the Mexico plant indicated that "a lot" of the workers in the Mexico plant spoke English and that 70% to 80% of them had had prior experience in the automotive industry.
Julio Alverez, who in 1998 and 1999 was employed by Freightliner as the quality-control manager for the Mexico plant,[9] testified that, at the time WCC's trucks were manufactured, Freightliner's Mexico plant was "ISO 9001 certified" and "TUV" audited. According to Alverez, "ISO 9001" is an international standard used to "evaluate *Page 890 
any organization, which verifies that [the organization's] quality systems meet a series of regulations that allows us to ensure the organization has standardized processes and that it's continually improving its results." Alverez testified that TUV is "an organization that exists throughout the world that has the authority of the ISO organization to do these types of evaluations." Alverez testified that TUV conducts audits to determine if a plant meets the ISO 9001 standards.
According to Alverez, in conducting those audits, TUV first verifies all the manufacturer's documents and the quality-control manual. Then, a TUV representative visits the different installations to corroborate that the procedures are being performed correctly, work instructions are being followed, and all legal requirements have been met by the manufacturer. Alverez testified that, in the third step of a TUV audit, a report of the audit results is issued and a decision is made whether to issue or to renew an ISO 9001 certificate to the manufacturer. If a plant is ISO certified, the holder of the certificate is authorized to export products manufactured at the certified location. Alverez testified that the Mexico plant was ISO certified in 1996 and that the plant had retained its certificate every year since then. Alverez also testified that a TUV audit was conducted at the Mexico plant in February 1999 and that, as a result of that audit, TUV recommended that Freightliner's Mexico plant retain its certification.
Whatley testified at trial that the employees of Freightliner of Southern Alabama did not withhold from him any information regarding Freightliner's Mexico plant.[10] Whatley testified that the Freightliner representatives he spoke with concerning the 40 Freightliner trucks manufactured in Mexico were "just as honest as they [could] be . . . [They were] honest, straight-up folks." Whatley also testified that he did not believe that anyone that he dealt with at Freightliner kept any information from him. Whatley did not allege that he questioned any Freightliner employees other than Murphy and Hawkins regarding the trucks ultimately delivered to WCC. At trial, Murphy and Hawkins denied that they knew the results of the audits performed at the Mexico plant.
At the close of the evidence, WCC agreed to dismiss its breach-of-implied-warranty claim. At the close of the plaintiff's case-in-chief and again at the close of all the evidence, Freightliner and Freightliner of Southern Alabama renewed their motion for a judgment as a matter of law on the suppression claim. The trial court denied that motion.
The jury returned a verdict against Freightliner awarding WCC $440,000 in compensatory damages and $750,000 in punitive damages. The jury found in favor of Freightliner of Southern Alabama on WCC's claim. As to the counterclaim asserted against WCC by Freightliner of Southern Alabama, the jury found in favor of WCC.[11] Freightliner filed a postjudgment motion for a judgment as a matter of law, a motion for a new trial or, alternatively, for a remittitur. The trial court denied the motion for a judgment as a matter of law and the motion for a new *Page 891 
trial; it apparently never ruled on the motion for a remittitur.[12]
Freightliner appealed, asserting among others, the following issue:
 "Whether the trial court erred when it failed to grant a judgment as a matter of law in Freightliner's favor on the suppression claim."
(Freightliner's brief at p. 7.) Because we conclude that Freightliner had no duty to disclose, we reverse the judgment in favor of WCC on the suppression claim and remand the case for the entry of a judgment in favor of Freightliner.
 Duty to Disclose
The trial court submitted WCC's suppression claim to the jury, which found in favor of WCC. Section 6-5-102, Ala. Code 1975, provides that "[s]uppression of a material fact which the party is under an obligation to communicate constitutes fraud. The obligation to communicate may arise from the confidential relations of the parties or from the particular circumstances of the case." The elements of a suppression claim are "(1) a duty on the part of the defendant to disclose facts; (2) concealment or nondisclosure of material facts by the defendant; (3) inducement of the plaintiff to act; (4) action by the plaintiff to his or her injury." Lambert v. Mail Handlers Benefit Plan,682 So.2d 61, 63 (Ala. 1996). It is evident from a reading of the statute and the caselaw that, without a duty to disclose, there can be no recovery for suppression.
We must first consider whether the trial court properly submitted the suppression claim to the jury. "`The question whether a party had a duty to disclose is a question of law to be determined by the trial court.'" Armstrong Business Servs., Inc.v. AmSouth Bank, 817 So.2d 665, 676-77 (Ala. 2001) (quotingBarnett v. Funding Plus of America, Inc., 740 So.2d 1069, 1074
(Ala. 1999)). In Armstrong Business Services, this Court stated:
 "The trial court must consider and apply the following factors in determining whether, under the particular circumstances, a duty to disclose exists: `(1) the relationship of the parties; (2) the relative knowledge of the parties; (3) the value of the particular fact; (4) the plaintiffs' opportunity to ascertain the fact; (5) the customs of the trade; and (6) other relevant circumstances.'"
817 So.2d at 677 (quoting State Farm Fire Cas. Co. v. Owen,729 So.2d 834, 842-43 (Ala. 1998)). Additionally, this Court has stated:
 "A duty to communicate can arise from a confidential relationship between the plaintiff and the defendant, from the particular circumstances of the case, or from a request for information, but mere silence in the absence of a duty to disclose is not fraudulent. . . .
". . . .
 "This Court has stated that whether one has a duty to speak depends upon a fiduciary, or other, relationship of the parties, the value of the particular fact, the relative knowledge of the parties, and other circumstances of the case. . . . When the parties to a transaction deal with each other at arm's length, with no confidential relationship, no obligation to disclose information arises when the information is not requested." *Page 892 
Mason v. Chrysler Corp., 653 So.2d 951, 954-55 (Ala. 1995).
Thus, we must consider whether the particular facts and circumstances of this case created a common-law duty on Freightliner's part to disclose. We find that the facts and circumstances of this case did not give rise to such a duty.
First, we note that this transaction was an arm's length commercial transaction.[13] "When the parties to a transaction deal with each other at arm's length, with no confidential relationship, no obligation to disclose information arises when the information is not requested." Mason,653 So.2d at 954-55. In Shutter Shop, Inc. v. Amersham Corp., 114 F.Supp.2d 1218, 1225 (M.D.Ala. 2000), the federal district court, applying Alabama law to a commercial transaction, stated:
 "In commercial transactions involving parties to arm's length negotiations, however, a bright line rule generally applies: The parties have no general obligation to disclose, but each has an affirmative duty to respond `truthfully and accurately' to direct questions from the other.
 "Thus, Alabama law presumes that the parties are capable of handling their own affairs and guarding their interests by asking reasonably specific, direct questions that will satisfy their need for information. The parties decide what information they need, and the law protects their rights to receive it."
(Citations omitted.)
Applying this law to the facts of this case, we recognize that, without a specific inquiry by Whatley, Freightliner clearly had no duty to disclose any information regarding the internal audit results for the Mexico plant. As this Court has recognized, the law generally allows a business to keep confidential its internal operating procedures and data unless that information is specifically requested. See Ex parte Ford Motor Credit Co.,717 So.2d 781, 787 (Ala. 1997) (citing Norman v. Amoco Oil Co.,558 So.2d 903 (Ala. 1990); King v. National Found. Life Ins. Co.,541 So.2d 502 (Ala. 1989); Surrett v. TIG Premier Ins. Co.,869 F.Supp. 919 (M.D.Ala. 1994)).
This Court has addressed similar issues in DaimlerChryslerCorp. v. Morrow, 895 So.2d 861 (Ala. 2004); Mason, supra; andMcGowan v. Chrysler Corp., 631 So.2d 842 (Ala. 1994). In each of these cases, the Court recognized that, without a specific inquiry from the purchasers, the defendant/sellers in those cases had no generalized obligation to disclose information regarding defects in similar products. We reach that same conclusion in this case.
We next must consider whether Whatley's conversations with Murphy and Hawkins regarding the trucks manufactured in Mexico imposed on Freightliner or Freightliner of Southern Alabama a duty to disclose to WCC the results of the internal audits conducted at the Freightliner plant in Mexico. However, after reviewing Whatley's testimony regarding his conversations with representatives of Freightliner and with representatives of *Page 893 
Freightliner of Southern Alabama, we find nothing that gave rise to such a duty.
In addition to his two conversations with Murphy summarized earlier in this opinion, Whatley described a third conversation with Murphy and Hawkins. During this conversation, Whatley, Murphy, and Hawkins discussed WCC's truck order and confirmed that Freightliner's Mexico plant would manufacture 40 trucks for WCC during January 1999. Also during this conversation, Whatley told Murphy and Hawkins that he had been unaware that Freightliner even had a Mexico plant until his telephone conversation with Murphy. Murphy or Hawkins responded that the Mexico plant was a former Mercedes-Benz passenger-automobile plant that was now building Freightliner trucks. Whatley admitted that he did not specifically ask during these conversations about the quality of the Freightliner products manufactured in Mexico.
However, in later testimony, Whatley claimed that, at some unspecified time, he asked 6 to 12 times if there were any differences between Freightliner's American-made trucks and Freightliner's Mexican-made trucks. Whatley did not identify when and with whom these conversations occurred.
From these conversations and allegations, we conclude that Whatley's comments and inquiries were not specific enough to impose on Freightliner or on Freightliner of Southern Alabama a duty to disclose to Whatley the results of the manufacturer's internal audit at the Mexico plant. First, Whatley acknowledged that the trucks were delivered to WCC in accordance with his exact specifications. Therefore, the response given to Whatley's question — "Aren't they the same specs that we talked about?" — was completely truthful.
Second, Whatley's question to Murphy — "Well, why wouldn't I want them from there?" — was not specific enough to give rise to an obligation on Freightliner's part to reveal the internal audit results for the Mexico plant. As noted in Shutter Shop, supra, "[a] disclosing party cannot be punished for fraudulent suppression unless the questioning party articulates with reasonable clarity the particular information it desires." 114 F.Supp.2d at 1226. Additionally, "[w]hile the law still requires, even in the present adversarial world of commercial transactions, that direct questions be responded to truthfully and accurately, the law also generally allows a business to keep confidential its internal operating procedures." Ex parte Ford Motor Credit Co.,717 So.2d at 787.
We also conclude that Whatley's alleged question, asked, he says, 6 to 12 times, about the differences between the American-made Freightliner trucks and the Mexican-made Freightliner trucks was not specific enough to create a duty to disclose the results of the internal audit at the Mexico plant. Whatley cannot identify to whom or when he posed this alleged question, and we find no other possibilities in the record. Therefore, we simply do not find in the record an adequate and sufficient inquiry from Whatley that imposed upon Freightliner or upon Freightliner of Southern Alabama a duty to reveal all of the potential differences between the Mexican-made Freightliner trucks, and the American-made Freightliner trucks, assuming it was possible to catalog such differences in a concrete and meaningful way.
The Court addressed a somewhat similar situation in Ex parteFord Motor Credit Co., 717 So.2d at 787. In that case, Bramlett, a buyer of a used automobile, had obtained financing through the dealer *Page 894 
from Ford Motor Credit Company at a rate of 15.49%. Although Bramlett agreed to that rate of interest, he asked the salesperson why the interest rate was so high. The salesperson responded by telling Bramlett that he was considered a poor credit risk because of a personal bankruptcy. The salesperson did not tell Bramlett that the 15.49% rate included a 3% commission to the dealer. Bramlett later sued the dealer and Ford Motor Credit, alleging fraudulent suppression.
In addressing that fraudulent-suppression claim, this Court stated:
 "Moreover, given the general nature of Bramlett's question [why the interest rate was so high], we believe it would be unreasonable to require that the Adamson salesperson reveal every factor that went into determining the exact interest rate offered to Bramlett. As Judge Thigpen noted in his dissenting opinion, `[t]he ultimate rate that Bramlett was offered was affected by a variety of factors, including the prime rate, the Federal Reserve Board's rate setting policy and procedure, the interest rates charged by other lenders, Bramlett's poor credit history, etc.' [Bramlett v. Adamson Ford, Inc., 717 So.2d 772, 779 (Ala.Civ.App. 1996) (Thigpen, J., dissenting).] While the law still requires, even in the present adversarial world of commercial transactions, that direct questions be responded to truthfully and accurately, the law also generally allows a business to keep confidential its internal operating procedures. Although this case specifically involves lenders and interest rates, interest is nothing other than the cost or price of borrowing money. Black's Law Dictionary, 812 (6th ed. 1990). The 3% commission agreement at issue here is nothing more than Adamson's profit on the loan transaction, which had a wholesale price and a retail price. We decline to recognize a common law duty that would require the seller of a good or service, absent special circumstances, to reveal to its purchaser a detailed breakdown of how the seller derived the sales price of the good or service, including the amount of profit to be earned on the sale."
717 So.2d at 787 (some citations omitted). We agree with the rationale of Ex parte Ford Motor Credit Co., supra, and hold that, in response to this question, it would be unreasonable to impose upon Freightliner a duty to disclose all of the potential reasons a prospective purchaser might not want an order filled from its Mexico plant or a duty to disclose all of the potential differences between a truck manufactured at one plant as opposed to a truck manufactured at another. The facts of this case certainly did not give rise to a duty to disclose the differences in internal quality control data between different Freightliner plants. As the record in this case demonstrates, a number of factors could account for those differences. Further, assuming this question was a reference to Whatley's inquiry, "[W]hy wouldn't I want them from there," Murphy's response was that "a Freightliner is a Freightliner." His response was a legitimate and truthful response.
Finally, we address WCC's claim that Freightliner assumed a duty to disclose the distinctions between trucks manufactured at its Mexico plant and those manufactured at its American plants when it asked Whatley if WCC would accept trucks manufactured by its Mexico plant. (WCC's brief at pp. 27-28.) WCC argues that by initiating the topic of the Mexico plant, Freightliner undertook the duty to fully disclose all the pertinent facts regarding that plant. In support of this argument, WCC relies on First AlabamaBank of Montgomery, N.A. v. First State Insurance Co.,899 F.2d 1045 (11th Cir. 1990). *Page 895 
In that case, the United States Court of Appeals for the Eleventh Circuit, quoting Ellis v. Zuck, 409 F.Supp. 1151 (N.D.Ala. 1976), stated:
 "Finally, even if one is not under a duty to speak, if he decides to do so, `he must make a full and fair disclosure,' without concealing any facts within his knowledge. Ellis, 409 F.Supp. at 1158 (citing Jackson Co. v. Faulkner, 55 Ala.App. 354, 315 So.2d 591 (1975))."
899 F.2d at 1056.
However, the Court of Appeals for the Eleventh Circuit did not include the full quote from Ellis v. Zuck; in Ellis, the court stated:
 "Nevertheless, even though one is under no obligation to speak as to a matter, if he undertakes to do so, either voluntarily or in response to inquiry, he is bound not only to state the truth but also not to suppress or conceal any facts within his knowledge which will materially qualify those stated; if he speaks at all, he must make a full and fair disclosure."
409 F.Supp. at 1158 (citing Jackson Co. v. Faulkner,55 Ala.App. 354, 315 So.2d 591 (1975)). Thus, once a party elects to speak, he or she assumes a duty not to suppress or conceal those facts that materially qualify the facts already stated. That party does not assume a duty to divulge all information that maybe or may become relevant to the other party. The duty imposed on the speaking party is to disclose those facts that are material to the ones already stated so as to make them truthful.
In this case, Freightliner did not assume a duty to disclose all of the facts it had regarding the Mexico plant, including internal quality-control data, by virtue of suggesting that WCC's order could be filled at the Mexico plant to accomplish WCC's goal of getting the trucks sooner. Had Whatley considered that information necessary to WCC's decision-making process, he could have inquired about that data. He did not. Additionally, neither Murphy nor Hawkins suppressed or concealed any facts within their knowledge that materially qualified their conversation with Whatley regarding the Mexico plant. The record does not reveal any other conversations by employees or agents of Freightliner that could serve as the basis for the alleged suppression.
Because we conclude that Freightliner had no duty to disclose the information allegedly suppressed from WCC, we conclude that the trial court improperly denied Freightliner's motion for a judgment as a matter of law on the suppression claim. We reverse the judgment entered on the jury's verdict and remand this case to the trial court for the entry of a judgment as a matter of law in Freightliner's favor.
REVERSED AND REMANDED WITH DIRECTIONS.
NABERS, C.J., and SEE, HARWOOD, and BOLIN, JJ., concur.
[1] WCC was originally incorporated under the name of Whatley Contract Carriers, Inc. In 1997, Whatley Contract Carriers, L.L.C., was formed. In late 1999 or 2000, the corporation was dissolved and Whatley continued doing business as the limited liability company until 2001. We shall refer to both the corporation and the limited liability company as "WCC" unless a distinction is required for clarity in the opinion.
[2] Whatley testified that he elected to purchase trucks from Freightliner because Freightliner offered competitively priced trucks that were comparable in value to other manufacturers' trucks, but Freightliner offered a much larger dealer network. A large dealer network was important to Whatley because WCC operated its trucks all over the country.
[3] According to the parties, the actual sale of a long-haul truck did not occur until the truck had been manufactured and was ready for delivery. Also, according to Freightliner, it was not unusual for manufacturers of long-haul trucks to require an extended time for production because of the high demand for such trucks.
[4] At trial, there was some debate whether the written warranties were effective or not. However, Whatley eventually acknowledged that he was aware of the written warranties and that he had accepted repair work on the trucks under the written warranties.
[5] WCC retained ownership of the other two Freightliner FLD 120 trucks.
[6] Whatley stated that he usually sold his long-haul trucks after they had been driven 500,000 to 750,000 miles.
[7] According to testimony from Guillermo Valdez, the quality-assurance manager at Freightliner's Mexico plant, a "mini-audit" is "a product audit which is performed to a complete truck once this truck is released from the production area . . . [I]t verifies all the systems that the truck is complete and the performance of the truck on the road. Also, we are seeing all the discrepancies or the details regarding paint, finishing of the product, performance of the product and the specifications. That means we have to verify that all the options are built and are mounted in the truck." Valdez also testified that a "discrepancy" is "a detail or something in the assembly line that is not complete or has some small problem or detail."
[8] The testimony indicated that the Mercedes-Benz standards were more demanding on cosmetic defects and that "it was much more difficult to keep a low score through the Mercedes system than it was through [a] Freightliner commercial system."
[9] Alverez was previously employed by the Mercedes-Benz plant in various positions, including as a training coordinator and in the area of quality control. He remains employed with Freightliner as a manager of quality control.
[10] It was undisputed that none of the employees at Freightliner of Southern Alabama had access to any information regarding the results of the internal audits at Freightliner's Mexico plant.
[11] Freightliner of Southern Alabama did not appeal the judgment entered on its counterclaim; WCC did not appeal the judgment in favor of Freightliner of Southern Alabama on its suppression claim.
[12] We find no indication in the record that the trial court conducted a hearing on the motion for a remittitur, although Freightliner requested such a hearing. However, because of our disposition of this case on the motion for a judgment as a matter of law in Freightliner's favor, we need not address the outstanding motion for a remittitur and the failure of the trial court to hold a hearing on the motion.
[13] Even if we were inclined to view this transaction as a consumer, as opposed to a commercial, transaction, we would be forced to conclude that Whatley was well versed in the trucking industry and in the business of purchasing long-haul trucks. He was not in an unequal bargaining position with Freightliner, and he was fully capable of protecting his own interests. Therefore, we could not conclude, even if this were a consumer transaction, that a special relationship, a confidential relationship, or any other special circumstances relating to the bargaining positions of the parties gave rise to a duty to disclose on Freightliner's part.