BRYAN, Justice
(dissenting).
After a review of the record and the arguments presented in this appeal, I believe that CNH America, LLC (“CNH”), did not have a duty to disclose the allegedly suppressed fact to HTI Hydraulic Technologies, LLC (“HTI”), and Ligón Capital, LLC (“Ligón”), and, thus, that the trial court improperly denied CNH’s motion for a judgment as a matter of law on the fraudulent-suppression claims brought by Ligón and HTI. A majority of this Court holds otherwise; I respectfully dissent.
To fully understand the underlying facts of this particular case, a discussion of the business relationship between CNH and HTI is necessary. CNH is an original equipment manufacturer (“OEM”) of agricultural and construction equipment. When Ligón formed HTI in September 2007, HTI became the seventh hydraulic-cylinder company owned and managed by Ligón. HTI was a “sole-source supplier,” i.e., the only supplier, of certain hydraulic cylinders to CNH for use in manufacturing CNH’s products. T.J. Bonfield, vice president of purchasing at CNH, explained that the hydraulic cylinders produced by HTI were highly engineered components and that a supplier of these cylinders must be *1217 approved by the engineering, purchasing, and quality groups within CNH before that supplier is qualified to supply hydraulic cylinders to CNH. Bonfield testified that it takes approximately 12 months and costs CNH millions of dollars to qualify a new supplier under CNH’s stringent qualification standards[7] and that the only way CNH can remain competitive in its market is to rely on a sole-source supplier for specialized parts. Bonfield testified that sole-source supplying is a common practice in the industry.
Sole-source supplying facilitates a balance of power between an OEM and its supplier. For example, in this case, HTI had leverage over CNH because CNH had no other supplier for the specific hydraulic cylinders that were produced by HTI and, thus, no other way of obtaining the cylinders produced by HTI. HTI was also a “just-in-time” supplier of hydraulic cylinders to CNH, meaning that hydraulic cylinders were delivered to CNH only when CNH gave HTI a firm order. Thus, if HTI did not ship quality cylinders to CNH in a timely manner, CNH’s manufacturing process could be delayed or brought to a halt. On the other hand, in the absence of a long-term supply contract, CNH, one of HTI’s biggest customers, could withdraw its business from HTI at any time.[8]
John McMahon, an owner of Ligón with decades of business experience, testified that it was the job of purchasing managers at companies like CNH to make sole-source suppliers insecure about the business relationship in order to keep the suppliers working hard. McMahon testified that OEM’s like CNH threaten to take their business elsewhere if the sole-source suppliers’ prices are too high or the quality too low. The process of an OEM moving its business to another supplier is called “re-sourcing.” To the OEM, it is essential that the re-sourcing decision be kept confidential so that the supplier does not use its leverage over the OEM to raise prices or stop shipment of parts and, thus, disrupt the OEM’s supply chain. Bonfield testified that it was his experience in the industry that a decision to re-source is kept confidential in order to minimize the risk of supply disruption. Even if an OEM desires to re-source, the process takes as long as 12 months, and the timing of the actual re-sourcing is usually uncertain because the process depends heavily on the viability of a new supplier.
Here, Allessandra Canali, a commodity manager in the purchasing department at CNH, testified that when she began working for CNH in June 2007, “there was a very specific plan in place of who [CNH] intended to resource to, [and] exactly what suppliers [CNH] intended to enter agreements with other than [Hydraulic Technologies, Inc.].” Karthick Selvan, a commodity buyer at CNH, testified that, consistent with industry practices, CNH’s decision to re-source business from HTI was to be kept confidential, and he identified HTI’s *1218 knowledge of the re-sourcing plan as the greatest risk to successfully re-sourcing from HTI. Bonfield testified that no part of CNH’s plan, either before or after Li-gón purchased the assets of Hydraulic Technologies, Inc. (“Hydraulic”), included maintaining HTI as a supplier. However, Bonfield also testified that, as of September 2007, CNH did not have confirmation that any of the potential suppliers would actually meet CNH’s qualification standards and be willing to take CNH’s business for the price CNH was willing to pay for the hydraulic cylinders. It was undisputed that CNH could not actually resource from HTI to another supplier until another supplier had met CNH’s stringent qualification standards.
In May 2008, CNH finally qualified an alternate supplier for the cylinders produced by HTI. On May 30, 2008, CNH notified HTI that it was re-sourcing to another supplier and that it would not place any additional firm orders with HTI. CNH considered the move from HTI to the alternate supplier a “textbook” example of how to properly manage a difficult re-sourcing transition in the industry.
HTI and Ligón argue that CNH fraudulently suppressed the fact that, “prior to September 2007, [CNH] had entered into a relationship with a supplier with whom [CNH] had decided to replace HTI” and that HTI and Ligón had suffered damage as a result of the fraudulent suppression. Whether CNH had a duty to disclose their decision to re-source the hydraulic cylinders is a question of law, and if there was no duty to disclose, then HTI and Ligón could not recover on their fraudulent-suppression claims. See Freightliner, L.L.C. v. Whatley Contract Carriers, L.L.C., 932 So.2d 883, 891 (Ala.2005).
As the main opinion implicitly acknowledges, it cannot seriously be disputed that CNH and HTI were involved in a series of arm’s length commercial transactions and that there was no confidential relationship between CNH and HTI or CNH and Li-gón. It also cannot be disputed that CNH, HTI, and Ligón each had a tremendous amount of experience in the industry and that none of the companies involved in this proceeding had any specialized knowledge of the industry that one of the other companies did not have. In Freightliner, this Court stated:
“ “When the parties to a transaction deal with each other at arm’s length, with no confidential relationship, no obligation to disclose information arises when the information is not requested.’ Mason [v. Chrysler Corp.], 653 So.2d [951,] 954-55 [ (Ala.1995) ]. In Shutter Shop, Inc. v. Amersham Corp., 114 F.Supp.2d 1218, 1225 (M.D.Ala.2000), the federal district court, applying Alabama law to a commercial transaction, stated:
“‘In commercial transactions involving parties to arm’s length negotiations, however, a bright line rule generally applies: The parties have no general obligation to disclose, but each has an affirmative duty to respond “truthfully and accurately” to direct questions from the other.
“ ‘Thus, Alabama law presumes that the parties are capable of handling their own affairs and guarding their interests by asking reasonably specific, direct questions that will satisfy their need for information. The parties decide what information they need, and the law protects their rights to receive it.’
“(Citations omitted.)”
932 So.2d at 892 (emphasis added; footnote omitted).
Glen Campbell, the general manager of HTI, testified that, in September 2007, he asked Selvan if HTI was “still going to be [CNH’s] supplier going forward,” and, ae- *1219 cording to Campbell, Selvan responded that “[CNH] need[ed] [HTI] in the short term and long term, we are committed.”[9] Campbell admitted that there was no time frame attached to Selvan’s answer and that he understood Selvan to say that CNH was making a commitment to place at least some firm orders for an unspecified time into the future. Campbell did not ask for clarification of that answer.
In early 2008, shortly after HTI had purchased $8.2 million in machinery to meet CNH’s demands, Campbell told Sel-van that HTI was spending a lot of money to meet CNH’s needs and that HTI was making a commitment. Campbell asked Selvan, “Where does [CNH] lie?” Selvan responded by referring Campbell to the firm orders and the planning orders that were in place between CNH and HTI and telling him to continue to send product to CNH in accordance with those orders. Campbell also asked Canali for a long-term commitment from CNH. Canali responded by stating that most of CNH’s suppliers did not operate pursuant to a long-term contract and that HTI should continue to send CNH product in accordance with the firm orders and the planning orders in place. According to Campbell, Canali also told him that CNH was committed to HTI in the short-term and the long-term. Campbell testified that the “natural” question for him to ask was whether CNH was planning to re-source, but he did not recall asking anyone from CNH that specific question. It was undisputed that Campbell was the only individual who asked representatives of CNH about their commitment to HTI.
When Ligón purchased Hydraulic’s assets and formed HTI, McMahon was aware that HTI was considered an inefficient supplier and that there was a risk of losing CNH’s business to an alternate supplier. McMahon testified that “it would have been crazy for [CNH] not to have considered other alternatives, given ... the fact that HTI was in bankruptcy. We certainly would have done it.” Despite this, McMahon testified that no one from Ligón asked CNH if they were seeking alternative suppliers for the hydraulic cylinders produced by HTI and that he did not ask anyone from CNH how long CNH planned to be a customer of HTI. McMahon stated that he did not think he had any responsibility to ask the question that was “obvious under the circumstances”— whether CNH was planning to re-source— when he spoke to Bonfield before he purchased Hydraulic’s assets.
McMahon testified that CNH’s decision to re-source was “crucial information” that would have affected everything “we” did. According to McMahon, HTI would not have purchased $8.2 million in new machinery that was primarily for CNH parts in early 2008 if it had known that CNH was planning to re-source. However, McMahon also testified that HTI purchased the new equipment with the knowledge that the customer relationship with CNH could be lost at any time and that neither Ligón nor HTI had discussed with CNH its long-term commitment to HTI before the equipment was purchased.
*1220 The main opinion concludes that the questions presented by Campbell were “reasonably specific and direct so as to impose a duty to disclose upon CNH,”' because “the CNH representatives understood exactly what Campbell was inquiring about when he asked” Selvan about CNH’s commitment to HTI. 160 So.3d at 1202. Even if CNH representatives knew what Campbell was “hinting” at, given the facts of this particular case — the delicate balance of power inherent in the business relationship of CNH and HTI as OEM and sole-source supplier, the parties’ equal knowledge of the industry, McMahon’s assumption that CNH would be looking for alternate suppliers, and Campbell and McMahon’s acknowledgment that they knew the appropriate specific question to ask but did not ask it — I must conclude that Campbell’s questions were not “reasonably specific and direct” questions that would give rise to a duty on CNH’s part to disclose to HTI or to Ligón that CNH was pursuing a re-sourcing strategy. Pursuant to the standard set forth in Freightliner, “without a specific inquiry by [HTI], [CNH] had no duty to disclose any information regarding the internal [re-sourcing policies]” or CNH’s ongoing negotiations with other potential suppliers. Freightliner, 932 So.2d at 892.
The main opinion further concludes that “even if a duty to disclose was not otherwise created by Campbell’s questions, that duty was certainly assumed by CNH when Selvan and Canali voluntarily spoke of CNH’s long-term commitment to HTI.” 160 So.3d at 1203. This is so, the majority concludes, because “the fact that CNH had already decided to replace HTI materially qualified Selvan’s statement that CNH was ‘committed’ to HTI.” 160 So.3d at 1203. See Freightliner, 932 So.2d at 895 (“The duty imposed on the speaking party is to disclose those facts that are material to the ones already stated so as to make them truthful.”).
Had Campbell asked the direct, “natural,” and “obvious” question, Selvan, if he chose to respond, would have been under a duty to respond “truthfully and accurately” to the question. 932 So.2d at 892. Pursuant to Freightliner, parties in arm’s length commercial transactions are required to respond ‘“truthfully and accurately1 to direct questions from the other [party].’ ” Id. at 892. Campbell asked only general questions. Nevertheless, Sel-van responded to those questions with a truthful, albeit nonspecific, response. Although CNH’s internal policy indicated a plan to replace HTI, the undisputed evidence demonstrated that CNH was not certain when that goal would be realized. It was not until May 2008 that an alternate supplier was approved to replace HTI. Thus, at the time of Campbell’s general inquiries, CNH had no choice but to be “committed” to doing business with HTI in the short-term and for the indefinite future. Furthermore, it is clear that Campbell did not take Selvan’s and Canali’s alleged statements regarding CNH’s short-term and long-term commitment to HTI as a guarantee of future business from CNH for any set period. Campbell admitted that there was no time frame attached to Selvan’s answer and that he understood Selvan to say only that CNH would place some firm orders for an unspecified amount of time.
Because a direct question was not asked, Selvan and Canali had no duty to respond or to materially qualify their general replies with information that was not specifically requested by Campbell. To conclude otherwise — that a nonspecific response to a nonspecific question requires “material qualifications” — essentially negates the “bright line rulé” discussed earlier in Freightliner, that “ ‘parties have no gener *1221 al obligation to disclose’” but, if they choose to respond, they must respond “ ‘ “truthfully and accurately” to direct questions.’” 932 So.2d at 892 (emphasis added). From all that appears, this is a well established industry standard.[10]
The majority’s conclusion is contrary to the presumption under Alabama law “ ‘that ... parties [to commercial transactions] are capable of ... guarding their interests by asking reasonably specific, direct questions that will satisfy their need for information.’” Freightliner, 932 So.2d at 892 (quoting Shutter Shop, Inc. v. Amersham Corp., 114 F.Supp.2d 1218, 1225 (M.D.Ala.2000)). Neither Campbell nor anyone from Ligón ever made a direct, specific inquiry regarding CNH’s intent or plans to re-source its hydraulic-cylinder business, even though McMahon described CNH’s re-sourcing decision as “crucial information” that would have affected “everything we did.” Campbell and McMahon admitted that they did not ask the “natural” question that would have elicited the information HTI and Ligón now argue was fraudulently suppressed. It is beyond comprehension that Ligón and HTI have now obtained a windfall of $11.4 million, including punitive damages, when (1) they failed to ask the question that they concede was “obvious under the circumstances” and that would have entitled them to receipt of the “crucial information” they desired, and (2) HTI knew that the answers given by Selvan and Canali were not a commitment by CNH to a business relationship with HTI for any set period.
Because I believe that Ligón and HTI did not demonstrate, pursuant to Freight-liner or otherwise, that CNH had a duty to disclose the allegedly suppressed facts as to its intent to re-source, I dissent from the majority’s decision affirming the trial court’s judgment. I believe that this Court has an obligation to uphold clearly established legal standards; the majority’s decision today muddies the otherwise clear legal duties set forth in Freightliner.

. John McMahon, who formed Ligón in 1999 and who has subsequently purchased several cylinder-manufacturing companies, testified that "CNH has the most rigorous qualification process of anyone that we deal with."

. In its brief, amicus curiae Hyundai Motor Manufacturing Alabama, LLC, states:
"As this case shows, the balance between a manufacturer and a single source supplier is delicate. Indeed, it is not an overstatement to say that if a single source supplier decides for whatever reason to stop supplying a critical part or even to delay deliveries for whatever reason, the entire manufacturing process is in jeopardy. If a supplier knows that the manufacturer plans to replace it in the future, the supplier loses its economic incentive to satisfy the manufacturer by making, delivering, and charging a fair price for quality parts.”
Hyundai’s brief, at 12-13.

. The record indicates that CNH went to great lengths to assist HTI in improving its operations. For several months into the fall of 2007, CNH conducted daily conference calls with HTI to make sure that HTI distributed completed cylinders to the CNH plants that needed the cylinders most. CNH also provided HTI with a quality engineer, Ron Angle, who was at HTI’s facilities as many as four or five days a week to help HTI improve its manufacturing processes. Campbell testified that Angle, who spent approximately 400 hours working at HTI at CNH’s expense, was able to help HTI improve its processes with regard to all of its customers, not just CNH.

. In its brief, amicus curiae Hyundai Motor Manufacturing Alabama, LLC, argues:
"The Freightliner rule, in a word, works. The rule lets the business community know that if it wants information, all it has to do is ask. And it lets the business community know that if it asks, the other party is required to either refuse to provide the information requested or give a truthful response. This Court should not throw away a rule that provides stability to the business community in favor of a rule that would create confusion and uncertainty.”
Hyundai's brief, at 14.