Denbo Iron Metal Company, Inc. ("Denbo"), and its executive vice president Joel Denbo ("Joel") sued Thomas R. DeBray and the law firm in which he was a partner, Kaufman 
Rothfeder, P.C. ("K R"), alleging legal malpractice arising out of K R's representation of Denbo. Also named as a plaintiff in the complaint was Tennessee Valley Recycling, LLC, whose only standing in the case was stated by the complaint to be that it had been Denbo's "operating entity" "since 2000"; accordingly, all references to "Denbo" for periods after 2000 will include Tennessee Valley Recycling. All three plaintiffs will be referred to collectively as "the plaintiffs"; DeBray and K R will be referred to jointly as "the defendants." The trial court entered a summary judgment in favor of the defendants in this legal-malpractice action. The plaintiffs appeal; we affirm.
From 1976 to 1979, Denbo shipped scrap batteries and battery plates to a disposal facility located in Leeds, which was operated by Interstate Lead Company ("ILCO"). In the mid-1980's the United States Environmental Protection Agency ("the EPA") listed the site as a Superfund site ("the ILCO site"). On October 19, 1993, the EPA notified Denbo that it was a "potential responsible party" with respect to the ILCO site. Joel searched for, but was unable to locate, insurance policies covering the relevant time periods, but he was able to locate certificates of insurance for the years in question. He contacted Denbo's former insurance agent to report that he had been notified by the EPA of the potential claim and to request copies of the insurance policies covering the applicable periods. The agent informed Joel that copies of the policies were no longer available. Denbo then retained K R to represent it in matters relating to the ILCO site ("the ILCO claim"). On December 11, 1993, Joel wrote DeBray, forwarding copies of the certificates of insurance he had located, explaining that the actual policies could not be located by either Denbo or its agent, and stating, "I would like for you to notify these companies of our claim against them and that we expect them to pay our liability."
The itemized billings from K R to Denbo for services rendered over the period beginning on October 14, 1993, and ending on October 31, 2000, reflect that throughout that period DeBray and other K R personnel were working actively on the ILCO claim. The itemized billing entries identify by individual, date, and description *Page 985 
numerous telephone conversations, written communications, meetings, conferences, and other contacts and communications between DeBray and other K R personnel, on the one hand, and Joel and other Denbo personnel, on the other hand, relating specifically to the ILCO claim. Records submitted by Denbo also show that it paid all of those billing statements with its own funds, never seeking payment or reimbursement from any insurance company or inquiring of DeBray or K R why payment or reimbursement by an insurance company was not forth-coming. According to the plaintiffs' complaint in their legal-malpractice action, Denbo paid DeBray and K R "over $104,000.00 in fees and expenses arising out of the EPA claims and [the] Federal lawsuits," which were instituted in 1998, as hereinafter explained.
Other than as reflected by the detailed billing entries, neither the parties' appellate briefs nor the record reflects what transpired over the course of the two years following Denbo's notification by EPA of the ILCO claim in October 1993. The complaint states, however:
 "On October 18, 1995, Joel Denbo telephoned DeBray to discuss Denbo's coverage. Joel Denbo spoke with DeBray's paralegal about whether DeBray had notified the insurance companies of the claim and whether coverage would be afforded Denbo. On December 7, 1995, DeBray's paralegal wrote a letter to Joel Denbo stating that she had gone through the files of Kaufman Rothfeder to determine whether notice had been sent and coverage would be afforded Denbo. She stated that she could not locate the insurance certificates. On December 11, 1995, Joel Denbo mailed DeBray's paralegal a second copy of the insurance certificates. He was assured that DeBray would take care of giving notice to the insurance carriers."
Shortly thereafter DeBray prepared, but never sent, letters to the insurance companies identified by the certificates of insurance, which would have notified them of the claims against Denbo, asserting that "each or all of the insurers may be obligated to provide a defense or indemnify Denbo Iron pursuant to its individual policy coverage." Joel states in the affidavit he filed in opposition to the defendants' motion for a summary judgment that "[d]uring 1997 DeBray continued to represent Denbo in the ILCO claim. I talked with DeBray by telephone about the insurance matters in 1997, and was again assured that the matters were being timely handled."
The briefs of the parties and the record are again silent, apart from the dated entries in K R's continuing billing statements to Denbo, concerning what pertinent events might have transpired during 1997 and 1998, up to October 8, 1998, when the United States of America, on behalf of the EPA, sued Denbo and numerous other companies in federal district court for their alleged contribution of hazardous substances to the ILCO site, seeking damages in excess of $16,000,000, together with other relief. On November 18, 1998, Exide Corporation and Johnston Controls, Inc., filed a separate action in the same federal district court against Denbo and others seeking private damages relating to the ILCO site. The plaintiffs allege in their legal-malpractice complaint against the defendants that "Denbo continued to ask defendants if they had notified the insurance carriers of the claims and litigation. The defendants advised Denbo that the insurance claims were being handled in a timely manner." Finally, however, on December 2, 1998, Joel, assisted by his cousin, Don Denbo, an insurance agent, met with De-Bray. According to Joel's affidavit, "[d]uring *Page 986 
this meeting DeBray advised he had not yet contacted the comprehensive liability insurance carriers for 1976 through 1980." Neither Joel's affidavit nor any other part of the record discusses his reaction to that revelation; the affidavit simply goes on to state that Don Denbo advised DeBray how to contact the companies; that "DeBray stated that he would takecare of the notification to the companies and not to worry about it"; that Don Denbo then sent DeBray information concerning exactly who to notify and DeBray assured Don Denbo a few days later that "he would take care of the notification"; and that when Joel talked to DeBray on December 29 and December 30, 1998, DeBray assured him on each occasion that "the notification was taken care of"
The two federal actions were consolidated and, according to Joel's affidavit, "[i]n October or November 1999 1 was amended into the complaint in my individual capacity and it was alleged that I had authority to exercise control over the disposal of hazardous substance at the ILCO site in 1976 through 1979." Joel retained DeBray to represent him in his individual capacity in the litigation. The billing records reflect that DeBray and K R continued to represent Denbo throughout with respect to the ILCO claim and the federal litigation and included within the itemized activities on billing statements are frequent, communications and conferences between DeBray and Joel. For example, the billing statement covering the period from June 10, 1998, to June 30, 1999, details numerous such contacts between them, and totals $15,829.72. Denbo paid that statement in two equal payments, one on August 17 and the other on September 10, 1999. K R's statement to Denbo for the next billing period, covering activities up to January 5, 2000, totaled $14,898.89, and Denbo paid that statement on February 10, 2000. Another billing statement was issued for services rendered from January 17, 2000, to March 24, 2000, in the amount of $5,177.36; Denbo paid that statement on May 10, 2000. Subsequent billing statements were paid by Denbo on June 10, August 10, September 9, and December 9 of that year. At no time, as far as the record reflects or the plaintiffs suggest, did Joel or Denbo question why no defense or other financial assistance was being provided by any insurance company.
According to Joel's affidavit, "[s]ome time in August 2000 DeBray called me and said he thought he could settle the cases in the $150,000.00 range." DeBray had previously filed separate motions for a summary judgment on behalf of Denbo and Joel in the federal litigation and on August 16, 2000, he filed with the court formal withdrawals of each of those summary-judgment motions, advising the court that Denbo and Joel had each "now settled with the plaintiffs and no longer wishes to pursue [its] [his] motion." Joel further asserts in his affidavit:
 "DeBray sent a proposed settlement agreement sometime in October. DeBray called me and told me that he had a settlement for $158,000.00 and urged me very strongly to sign. DeBray told me that it would cost me more than it was worth to pursue those arguments in court, and advised of the threat that if I did not sign, the government would not release me personally from the suit, and that I could be held personally responsible for whatever the amount of the judgment ultimately was jointly and severally in the amount of $1.2 million. Under this pressure, I told DeBray that I would sign the settlement, and did sign the settlement. DeBray also advised that I must sign the note on behalf of Denbo. I signed the note for Denbo, based upon the advice I received from DeBray concerning what could happen *Page 987 
to me personally if I did not sign the agreement."
According to Joel's affidavit, he and Sol Miller, whose separate affidavit explains that "[i]n February 2000 I became employed by Tennessee Valley Recycling, LLC as Chief Manager-Administration," thereafter attempted to talk to DeBray concerning the notice to the insurance companies, but DeBray never returned any of their telephone calls or facsimile communications. Joel also states in his affidavit:
 "In April and May of 2002 I discovered, through attorney Bill Shinn [Denbo's regular attorney] and Sol Miller that the insurance companies had never been notified of the claims or the lawsuits, and that they were denying coverage because of late notice and because Denbo had entered into a settlement agreement without notifying the company. The companies were also refusing to pay for the attorney's fees in the defense of the claims."
One of the insurers DeBray had been charged with contacting and demanding coverage from was American Liberty Insurance Company. Its representative wrote Shinn on March 6, 2002, to confirm that they had been given notification of the claims and litigation on September 5, 2001, but stating that the insurance policies that would have provided coverage required that "[i]f claim is made or suit is brought against the insured, the insured shall immediately forward to the Company every demand, notice, summons, or other process received by him or his representative." Furthermore, those insurance policies directed that "[t]he insured shall not, except at his own costs, voluntarily make any payment, assume any obligation, or incur any expenses. . . ."
On March 25, 2002, a representative of Statesman Insurance Company wrote Shinn to acknowledge receipt of Shinn's "tender letter," which had expressed Shinn's belief that Statesman had issued Denbo a policy covering the period November 20, 1976, to November 20, 1977. Shinn was advised that a search of Statesman's records had not discovered any evidence of the policy. Nonetheless, relying on standard policy provisions, Statesman, through its representative, pointed out that Denbo had been bound to provide reasonable notice of the claims and suits for which coverage was being sought and that payments made or obligations assumed by the insured without the consent of the carrier were deemed to be voluntarily incurred and coverage for those payments or obligations therefore precluded. Finally, Statesman referred to the standard policy provision pursuant to which coverage for attorney fees applied only to fees incurred subsequent to the tendering of the claim to the insurer; hence, "[a]ny fees incurred before tender will not be covered."
For all that appears in the record and the parties' briefs, the plaintiffs have acquiesced in the insurers' denials of coverage based on late notice, electing instead to pursue the legal-malpractice action against the defendants. That action was filed on March 26, 2003, but, pursuant to a "tolling agreement" the parties had previously entered into, the action is deemed to have been filed on October 1, 2002.
 Analysis
The Alabama Legal Services Liability Act, § 6-5-570 et seq., Ala. Code 1975 ("the ALSLA"), applies to all actions against "legal service providers" alleging a breach of their duties in providing legal services. Section 6-5-572(1) provides, in pertinent part:
 "A legal service liability action embraces all claims for injuries or damages or wrongful death whether in contract or in *Page 988 
tort and whether based on an intentional. or unintentional act or omission. A legal services liability action embraces any form of action in which a litigant may seek legal redress for a wrong or an injury and every legal theory of recovery, whether common law or statutory., available to a litigant in a court in the State of Alabama now or in the future."
Section 6-5-574 provides:
 "(a) All legal service liability actions against a legal service provider must be commenced within two years after the act or omission or failure giving rise to the claim, and not afterwards; provided, that if the cause of action is not discovered and could not reasonably have been discovered within such period, then the action may be commenced within six months from the date of such discovery or the date of discovery of facts which would reasonably lead to such discovery. whichever is earlier; provided, further, that in no event may the action be commenced more than four years after such act or omission or failure; except, that an act or omission or failure giving rise to a claim which occurred before August 1, 1987, shall not in any event be barred until the expiration of one year from such date.
 "(b) Subsection (a) of this section shall be subject to all existing provisions of law relating to the computation of statutory periods of limitations for the commencement of actions, namely, Sections 6-2-1, 6-2-2, 6-2-3, 6-2-5, 6-2-6, 6-2-8, 6-2-9, 6-2-10, 6-2-13, 6-2-15, 6-2-16, 6-2-17, 6-2-30, and 6-2-39; provided, that notwithstanding any provisions of such sections, no action shall be commenced more than four years after the act, omission, or failure complained of; except, that in the case of a minor under four years of age, such minor shall have until his or her eighth birthday to commence such action."
(Emphasis added.)
In Floyd v. Massey Stotser, P.C., 807 So.2d 508,511 (Ala. 2001), we explained:
 "This Court has held that `the time limits imposed by [§ 6-5-574(a)] are to be measured from the date of the accrual of a cause of action and not from the date of the occurrence of the act or omission.' Michael v. Beasley, 583 So.2d 245, 252
(Ala. 1991). In discussing the point at which an action `accrues,' this Court has stated:
 "`"The statute . . . will not begin to ran until some injury occurs which gives rise to a maintainable cause of action. Garrett v. Raytheon Co., 368 So.2d 516 (Ala. 1979); Corona Coal Co. v. Hendon, 213 Ala. 323, 104 So. 799 (1925); West Pratt Coal Co. v. Dorman, 161 Ala. 389, 49 So. 849 (1909). . . . In actions such as the case at bar, the act complained of does not itself inflict a legal injury at the time it is done, but plaintiffs injury only follows as a result and a subsequent development of the defendant's act. `In such cases, the cause of action "accrues," and the statute of limitation begins to run, "when and only when, the damages are sustained."' Garrett v. Raytheon Co., 368 So.2d at 519. See also, Kelly v. Shropshire, 199 Ala. 602, 75 So. 291 (1917)."'
 "Cofield v. Smith, 495 So.2d 61, 62 (Ala. 1986) (quoting Payne v. Alabama Cemetery Ass'n, Inc., 413 So.2d 1067 (Ala. 1982))."
 "However, in the lead opinion in Ex parte Panell, 756 So.2d 862, 865 (Ala. 1999), Justice See, joined by Chief Justice Hooper and Justice Maddox, stated that the Michael and Cofield line of cases had ignored `the significance of the "act or omission or failure" language of *Page 989 
§ 6-5-574(a).' That lead opinion further stated that `a legal-malpractice cause of action accrues, and the statute-of-limitations period begins to run, when "the act or omission or failure giving rise to the claim' occurs, and not when the client first suffers actual damage."' Id. at 868."
Although Ex parte Panell, 756 So.2d 862 (Ala. 1999), was a plurality opinion, one of the dissenters in that case, Justice Cook, subsequently authored Ex parte Seabol,782 So.2d 212 (Ala. 2000). The Ex parte Seabol opinion contains the statement: "Under § 6-5-574, `a legal-malpractice cause of action accrues and the statute-of-limitations period begins to run, when "the act or omission or failure giving rise to the claim" occurs, and not when the client first suffers actual damage.' Ex partePanell, 756 So.2d 862, 868 (Ala. 1999)." 782 So.2d at 214. Five Justices concurred fully in the opinion and two others concurred in the portion of the opinion in which that statement appears. More recently, four members of the Court reaffirmed the holding of Ex parte Seabol, but a fifth concurred only in the result in the case, reiterating his view expressed in his special writing in Ex parte Panell to the effect that the limitations period of the ALSLA would begin to run on the date injury or harm occurred, not on the date of the occurrence of the act that caused the injury or harm. Dennis v.Northcutt, 887 So.2d 219, 222 (Ala. 2004) (Lyons, J., concurring in the result).
In its thorough and thoughtful order granting the defendants' summary-judgment motion, the trial court acknowledged the apparent "split of authority" in our caselaw concerning when the statute of limitations for a legal-malpractice action will begin to run, referring both to the "occurrence" approach of Exparte Panell, supra, and what the trial court referred to as the "damage" approach of Michael v. Beasley,583 So.2d 245 (Ala. 1991). As did this Court in Floyd v. Massey Stotser, supra, the trial judge concluded that it was unnecessary to elect between the two approaches because, he reasoned, the limitations period would pose a bar under either scenario, given the undisputed facts of the case. Responding to the plaintiffs' motion to alter, amend, or vacate its summary-judgment order, the trial court expanded upon its original rationale in an amendment to its order, but otherwise denied the motion.
We agree with the trial court that the limitations period of the ALSLA bars the plaintiffs' legal-malpractice action against the defendants, regardless of which approach is used.
Applying the "occurrence" rule, the plaintiffs' legal-malpractice action would be barred under the first clause of § 6-5-574(a) if "the act or omission or failure giving rise to the claim" occurred more than two years before October 1, 2002. Given DeBray's repeated failure to provide the insurance carrier notification of the ILCO claim before October 1, 2000, and his commitment of Denbo and Joel to a settlement on August 16, 2000, we need not concern ourselves with pinpointing "the" omission during that time frame that served to trigger the running of the two-year period of limitations. Suffice it to say that the two-year limitations period had clearly run on the plaintiffs' legal-malpractice claims under the "occurrence" approach before October 1, 2002.
Of course, § 6-5-574(a) goes on to provide that "if the cause of action is not discovered and could not reasonably have been discovered within such [two-year] period, then the action may be commenced within six months from the date of such discovery or the date of discovery of facts which would reasonably lead to such discovery, *Page 990 
whichever is earlier." Although Joel's affidavit states that it was "(i]n April and May of 2002" when he discovered that the insurance companies had never been notified, the aforementioned letters from the insurance carriers to Shinn, written on March 6 and March 25, 2002, respectively, establish that the discovery had occurred earlier. Likewise, Sol Miller states in his affidavit that "[o]n March 15, 2002, I wrote DeBray, and advised that the insurance companies were denying they had notice. . . ." Accordingly, the action filed October 1, 2002, was outside the six-month extension of time afforded by the first proviso of § 6-5-574(a).
Finally, the second proviso of § 6-5-574(a) states that "in no event may the action be commenced more than four years after such act or omission or failure." That absolute four-year bar is reiterated in subsection (b). Although the plaintiffs undertook to challenge the constitutionality of the four-year absolute "cutoff in their motion to alter, amend, or vacate the summary judgment, the trial court properly noted in its amendment to that order that the constitutional attack was untimely, and it consequently rejected their challenge. No constitutional challenge to the enforcement of the four-year bar is asserted on appeal, and that absolute bar, independent of all else, serves to preclude plaintiffs' legal-malpractice action when the "occurrence" approach is employed.
Alternatively, under the "accrual" or "damage" rule ofMichael v. Beasley, supra, the limitations period of the ALSLA begins to run as soon as the plaintiff sustains a legal injury. Sirote Permutt v. Bennett,776 So.2d 40, 45 (Ala. 2000). "The limitations period begins to run when the plaintiff first suffers `legal injury,' not when the plaintiff may later pay damages or suffer some compounding of the original injury. . . . Even if the plaintiff is ignorant of the injury at the time (except in fraud cases), the limitations period begins to run." Mississippi Valley Title Ins. Co. v.Hooper, 707 So.2d 209, 213 (Ala. 1997) (citations omitted).
In their legal-malpractice action, the plaintiffs claim as damages the attorney fees they paid K R, which, they contend, would have been covered under their insurance policies had the defendants not failed to timely notify the insurance companies of the claims against them and had Denbo and Joel not been led by DeBray to breach the insurance contracts by entering into the settlement agreement without first notifying the insurance companies. Given what we have explained concerning the sequence of K R's billings for attorney fees relating to the ILCO claim and the subsequent federal litigation, and Denbo's payment of that claim out of its own funds without any contribution by any insurance company, it is clear that the plaintiffs experienced their first legal damage at a point in time before October 1, 2000, i.e., more than two years before they instituted their legal-malpractice action on October 1, 2002. That is true even if the plaintiffs were ignorant of that injury at the time. Mississippi Valley Title Ins. Co., supra. The same can be said of the "damage" the plaintiffs incurred by DeBray's commitment, on their behalf, to a settlement on August 16, 2000.
What has previously been said concerning the unavailability of the six-month extension period provided by the second clause of § 6-5-574(a) in the context of the "occurrence" rule is equally applicable to an "accrual" or "damage" approach.
Likewise, the four-year absolute bar of § 6-5-574(a) and (b) is applicable, given that the plaintiffs suffered their first legal damage, in the form of their payment of "uncovered" attorney fees, more than four years before October 1, 2002. *Page 991 
The plaintiffs attempt to escape the bar of the ALSLA by invoking the protection of Ala. Code 1975, § 6-2-3, as made available under § 6-5-574(b).
 "In actions seeking relief on the ground of fraud where the statute has created a bar, the claim must not be considered as having accrued until the discovery by the aggrieved party of the fact constituting the fraud, after which he must have two years within which to prosecute his action."
§ 6-2-3.
To the extent that this Code section might otherwise be applicable, we agree with the assessment of the trial court: regardless of when Joel might be deemed to have earlier discovered DeBray's fraud with respect to his repeated assurances that the liability insurance carriers were being notified of the ILCO claim, Joel could not reasonably rely on that state of affairs after he acquired actual knowledge from DeBray himself on December 2, 1998, that all those prior assurances were false. See Foremost Ins. Co. v.Parham, 693 So.2d 409 (Ala. 1997), reinstituting the "reasonable reliance" standard for evaluating such reliance. As a matter of law, Joel's purported reliance on DeBray's renewed assurances was unreasonable, particularly in light of the fact that Denbo continued over the next two years to be billed substantial amounts by K R for services manifestly related to the federal litigation, and Denbo paid all of those billings out of its own pocket without attempting any independent verification that the insurance carriers had been properly notified. It is true that "[t]he statute of limitations is tolled as to a fraud claim if, after discovery of the fraudulent act and inquiry, the plaintiff is misinformed or falsely informed by the defendant and the plaintiff reasonably relies on the defendant's misrepresentation. Foremost Ins. Co. v.Parham, 693 So.2d 409 (Ala. 1997)." Ex parte AlabamaFarmers Coop., Inc., 911 So.2d 696, 703 (Ala. 2004).
In this case, Joel was not misinformed or falsely informed by DeBray on December 2, 1998, concerning DeBray's earlier fraudulent acts and omissions; on the contrary, DeBray admitted that his assurances to Joel over the course of almost five years had been untrue. Moreover, any renewed reliance by Joel on DeBray's renewed assurances was not reasonable, as a matter of law, given what Joel then knew. Even if Joel's renewed reliance might be deemed to have been reasonable initially, it could not have continued to be reasonable over the course of the next two years leading up to a point in time two years before October 1, 2002, given the substantial attorney fees for which Denbo was being billed over that period, which it was paying with full knowledge that no insurance company was funding or reimbursing the fees or otherwise providing a defense in the federal litigation. Likewise, any reliance that might have initially been reasonable immediately following December 2, 1998, would not have continued to be reasonable past August 2000, when De-Bray advised Joel that he and Denbo should commit to a settlement of approximately $150,000, which Joel and Denbo would be expected to pay.
Therefore, because the plaintiffs' legal-malpractice action is time-barred under all features of § 6-5-574, regardless of whether the "occurrence" approach or the "accrual" or "damage" approach is employed, and because the parties have not argued that one or the other of those two lines of authority must be repudiated and overruled, we need not further address that issue in this case.
Joel argues on appeal that the summary judgment did not address his individual claim against DeBray and K R based on *Page 992 
the fact that "DeBray did not notify the insurance carriers, American and Statesman, of the amended complaint naming Joel in his individual capacity at any time" following Joel's joinder in the federal litigation in October or November 1999. (Denbo and Joel's brief, p. 44.) No such claim is separately asserted by the plaintiffs' complaint, however; the plaintiffs simply assert that the defendants failed to give timely notice to the insurance companies of claims against Denbo and to demand coverage for Denbo for those claims. Accordingly, the trial court's summary-judgment order properly analyzed the issues for each of the plaintiffs, and Joel shows no error in that regard, given the state of the record.
Accordingly, we affirm the summary judgment.
AFFIRMED.
SEE, LYONS, WOODALL, STUART, SMITH, and BOLIN, JJ., concur.
NABERS, C.J., and PARKER, J concur in the result.