BOLIN, Justice.
Coilplus-Alabama, Inc., appeals from a summary judgment in favor of Johnnie F. Vann and Sirote & Permutt, P.C., in this legal-malpractice action. We affirm.

Facts and Procedural History

In 1998, Coilplus retained Johnnie F. Vann and the law firm at which he then worked, Sirote & Permutt, to advise it about the issuance of $8,000,000 in bonds (hereinafter referred to as the “1999 bonds”) for the expansion of its Athens steel-manufacturing plant. Vann recommended that the 1999 bonds be issued through the Industrial Development Board of Athens, and he advised Coilplus that the 1999 bonds would qualify as tax-exempt bonds under the rules of the Internal Revenue Service (“the IRS”). At the time the issuance of the 1999 bonds was being discussed, Vann was aware that a tax-exempt-bond issue in the face amount of $5,000,000 had been issued in 1984 for a Coilplus project (hereinafter referred to as the “1984 bonds”) and that the 1984 bonds had not been retired. According to the parties, for small-issue bonds to qualify as tax exempt, the total capital expenditures for the three years before the bonds were issued and the three years after the bonds were issued, combined with the amount of any outstanding bonds and including the bonds to be issued, may not exceed $10,000,000. See 26 U.S.C. § 144. On February 16,1999, an attorney with another law firm sent Vann a letter stating that Coilplus had outstanding bonds that had not been retired — i.e., the 1984 bonds. On February 19, 1999, an employee with The Bank of New York, the trustee for the 1984 bonds, sent Vann documents regarding the 1984 bonds. On March 25, 1999, the 1999 bonds were sold to purchasers.
Later in 1999, the IRS questioned whether Coilplus’s prior capital expenditures as represented in the documents and schedules that accompanied the 1999 bonds, when added to the face amount of the 1999 bonds, exceeded the small-issue amount allowed under 26 U.S.C. § 144. The investigation apparently concerned only whether certain capital expenditures would be counted toward the $10,000,000 cap and was not focused on the 1984 bonds or the effect of the 1984 bonds on the $10,000,000 cap allowed by 26 U.S.C. § 144. Coilplus received a favorable private-letter ruling from the IRS. Vann *900 sent Coilplus a letter on September 20, 2000, informing it of the favorable ruling, along with a copy of the private-letter ruling.
Apparently the IRS continued investigating the 1999 bonds and shifted its focus to whether the issuance of the 1999 bonds in light of the outstanding 1984 bonds violated the $10,000,000 cap, irrespective of the capital expenditures. On July 16, 2001, an IRS employee sent the following e-mail to the accounting supervisor at Coil-plus, which stated, in pertinent part:
“I have been doing some research on the $10 million Cap rule. It seems that the $5,000,000 bond that was outstanding on the date of issue (2/25/1999) of the $8,000,000 bond has to be included in computation of the $10 million cap. (Internal Revenue Code Section 144(a)(2)). IF this is the case, the total at the time of issue of the second bond would be $13,000,000 and therefore, over the cap. We may be wasting our time trying to come up with other capital expenditures.”
(Capitalization in original.)
On July 19, 2001, the president of Coil-plus forwarded and copied the IRS e-mail to several persons and added the following:
“This is an e-mail from the IRS Auditor. If her comments are true, then Coilplus-AL should have never pursued a non-taxable bond. If this is true, then I would be compelled to say that it appears that there was a complete failure of professional services in the matter of advice regarding the establishment of our bond issue.”
On August 9, 2001, the president of Coil-plus, Larry Doss, sent an e-mail regarding the 1984 bonds and the 1999 bonds to its parent company, Mitsubishi International Corporation:
“CPA [Coilplus-AL] Tax-exempt bond—
“Thursday 8/2/01—
“Meetings all day with
“Jim Schiefelbein-Bond Trustee, Bank of New York
“Heyward Hosch Ill-Attorney — Wal-ston Wells Anderson & Bains, Birmingham, AL
“Alma Dripps-IRS-Tax-exempt bond agent
“Hazel Dinsmore-IRS, Tax-exempt bond group manager
“Johnny [sic] Vann-CPA tax exempt bond council [sic] of the firm of Lanier, Ford, Shaver and Payne in Huntsville, previously with Sirote & Permutt at the time of the bond inception
“Sean Kelley-Vice Pres. AmSouth Bank
“Susan Journey-CPA.
“I called this meeting to settle this issue and determine next actions. Results of meeting:
“1. CPA tax exempt bond was defunct from the beginning because of the fact that the original 1984 $5,000,000 bond issue was still in effect when the 1999 $8,000,000 bond issue was instituted. All previous issues regarding CPA capital expenditure controls to avoid exceeding the cap are now immaterial. Cap was exceeded from the bond’s inception date in Feb. 1999. This finding is final as agreed to by all parties.
“2. Johnny [sic] Vann has been terminated as council [sic] of any kind for CPA. Mr. Vann should be prepared to call on his carrier of errors and omissions insurance. Outstanding bill to CPA from Mr. Vann regarding this matter will not be paid.
“3. Restitution and recovery costs associated with the revocation of the tax-exempt bond will be charged back to the parties who provided professional services and bond council [sic] to CPA.
*901 “4. Heyward Hosch III has been retained by CPA as bond council [sic] for the new taxable bond. Hosch III is currently putting together the total amount of charges that CPA will request as restitution. Litigation will be avoided, but if belligerence is encountered regarding restitution, this option will need to be seriously explored.
“5. Morgan Keegan has been selected as underwriter for the new taxable bond.
[[Image here]]
“Friday 8/3/01, Birmingham AL
“Met with Heyward Hosch III and Frank Kohn in Birmingham law firm office for almost 4 hours working on strategy for restitution and commencement of taxable bond.”
On September 20, 2001, the 1999 bonds were retired and refunded, effective as of the date of the issuance. On March 25, 2002, the president of Coilplus sent Sirote & Permutt a letter, stating:
“In 1999, Coilplus-Alabama, Inc., a subsidiary of Mitsubishi International Corporation, retained the services of Si-rote & Permutt as bond council [sic] for a bond in the amount of $8,000,000. Your firm’s councilor [sic] for this bond was Johnny [sic] Vann. Your firm and Mr. Vann were recommended to us by our contacts at AmSouth Bank.
“This letter and enclosed documentation explain how the advice and council [sic] we received from your firm was erroneous from the beginning and how this error in professional advice caused the Internal Revenue Service to disqualify and force the dissolution of the tax-exempt bond leading to substantial monetary loss to our company.
“Mr. Vann, in agreement with Am-South Bank, recommended that our company apply for a tax-exempt bond, which we did in compliance with their recommendation.
“The point on which the bond was revoked by the Internal Revenue Service was the $10,000,000 capital expenditure volume cap. The IRS audited our bond and discovered that since our original $5,000,000 bond was still in effect at the inception of the new $8,000,000 tax exempt bond, the bond never actually qualified for the tax exemption because the total of the two bonds exceeded the $10,000,000 capital expenditure volume cap. This critical issue was never brought to our attention by our council- or [sic], Mr. Vann and the bond was initiated in violation of this basic qualifying condition. The attached letter explains the events and their sequence of occurrence.
“An enclosed spreadsheet presents the losses to our company incurred from fees paid directly to Sirote & Permutt. It also presents the losses incurred from one time fees paid on the tax-exempt bond for which the full value was irretrievably forfeited due to the bond’s qualification failure. On this spreadsheet, the reimbursement requests for one-time fees are pro-rated by the time the bond was in force and amount of time that would have remained in the life of the bond after its revocation by the Internal Revenue Service.
“As a matter of honor, equity, and professional reputation, I submit this matter to your attention for a fair and reasonable financial resolution based on these real and documented losses to our company.”
On June 24, 2002, the chief operating officer of Sirote & Permutt responded to the letter, stating as follows:
“Thank you for letter and accompanying materials concerning Coilplus’s 1999 bond issue.
*902 “We have read the materials you forwarded and talked with Johnnie Vann concerning the circumstances surrounding the 1999 bond issue as well as his efforts on your behalf since September of 2001 in replacing the 1999 issue with your recent taxable issue, and the results thereof.
“While we regret very much any errors Mr. Vann may have made in connection with his representation of Coil-plus, we do not under the circumstances believe that equity demands reimbursement of amounts expended by Coilplus in connection with the 1999 issue. I trust that you will understand and appreciate our position.”
On October 31, 2002, Coilplus sued Vann and Sirote & Permutt under the Alabama Legal Services Liability Act, § 6-5-570 et seq., Ala.Code 1975 (“the ALSLA”), alleging negligence, wantonness, breach of contract, breach of a fiduciary duty, and suppression of material facts. Coilplus later amended its complaint to include the fact that it could have redeemed the 1984 bonds before the 1999 bonds were issued, thus ensuring the tax-exempt status of the 1999 bonds, if Vann and Sirote & Permutt had given it correct legal advice.
On December 2, 2002, Vann and Sirote & Permutt (hereinafter collectively referred to as “the defendants”) filed an answer in which they raised several affirmative defenses, including an assertion that Coilplus’s claims were barred by the two-year statute of limitations set out in § 6-5-574, Ala.Code 1975. The case was placed on the trial court’s administrative docket because Vann was recovering from a serious illness. In March 2007, the parties filed a joint motion to remove the case from the administrative docket, which the trial court granted, and the parties proceeded with discovery.
On April 29, 2008, the defendants filed a summary-judgment motion based on the ground that all Coilplus’s claims were barred by the statutory limitations period in the ALSLA. Coilplus filed a memorandum in opposition to the motion. The trial court held a hearing on the motion and accepted additional briefs from the parties. On January 7, 2009, the trial court entered a summary judgment in favor of the defendants.

Standard of Review

“‘“This Court’s review of a summary judgment is de novo. Williams v. State Farm Mut. Auto. Ins. Co., 886 So.2d 72, 74 (Ala.2003). We apply the same standard of review as the trial court applied. Specifically, we must determine whether the movant has made a prima facie showing that no genuine issue of material fact exists and that the movant is entitled to a judgment as a matter of law. Rule 56(c), Ala. R. Civ. P.; Blue Cross & Blue Shield of Alabama v. Hodurski, 899 So.2d 949, 952-53 (Ala.2004). In making such a determination, we must review the evidence in the light most favorable to the nonmovant. Wilson v. Brown, 496 So.2d 756, 758 (Ala.1986). Once the movant makes a prima facie showing that there is no genuine issue of material fact, the burden then shifts to the nonmovant to produce ‘substantial evidence’ as to the existence of a genuine issue of material fact. Bass v. SouthTrust Bank of Baldwin County, 538 So.2d 794, 797-98 (Ala.1989); Ala.Code 1975, § 12-21-12. ‘[Substantial evidence is evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved.’ West v. Founders Life Assur. Co. of Fla., 547 So.2d 870, 871 (Ala.1989).” ’ ”
*903 Gooden v. City of Talladega, 966 So.2d 232, 235 (Ala.2007) (quoting Prince v. Poole, 935 So.2d 431, 442 (Ala.2006), quoting in turn Dow v. Alabama Democratic Party, 897 So.2d 1035, 1038-39 (Ala.2004)).

Arguments

The issue presented for review in this case is whether Coilplus’s action brought under the ALSLA was timely filed. The resolution of this issue depends on a determination of when the statute of limitations on Coilplus’s claims began to run. Coil-plus submits that it brought multiple claims under the ALSLA (negligence, wantonness, breach of contract, breach of a fiduciary duty, and suppression of material facts) and that § 6-5-570, Ala.Code 1975, a part of the ALSLA, incorporates into the ALSLA all common-law and statutory causes of action against a legal-services provider. Coilplus argues that this Court in System Dynamics International, Inc. v. Boykin, 683 So.2d 419 (Ala.1996), held that a cause of action for breach of a fiduciary duty arising out of an IRS liability accrues only when the IRS first sends notice of a disallowance of a deduction. Coilplus further argues that the trial court in the present case erroneously concluded that the statute of limitations began to run in February 1999 when the bonds were issued, not on July 16, 2001, when the IRS sent notice of the possible disallowance of the tax-exempt status of the 1999 bonds and that the only difference between the breach alleged in the present case and the breach of fiduciary duty alleged in System Dynamics is that the defendants in the present case are lawyers.
Coilplus argues that its claims of negligence and wantonness did not accrue until there was a “manifest, present injury” under Griffin v. Unocal Corp., 990 So.2d 291 (Ala.2008). With regard to its fraud claim brought under the ALSLA, Coilplus argues that § 6-5-574 of the ALSLA sets out the specific statutory period for the commencement of actions and exceptions to that period and that § 6-2-3, which provides that in actions seeking relief on the ground of fraud the claim must not be considered as accrued until the discovery of the fraud, after which the aggrieved party has two years to prosecute, is one of the exceptions found in § 6-5-574(b).[1]
The defendants argue that all Coilplus’s claims brought under the ALSLA are barred by the two-year statute of limitations in § 6-5-574(a) and that the act or omission giving rise to Coilplus’s claims occurred on February 25, 1999, when the 1999 bonds were issued. They argue that under the caselaw interpreting the limitations period imposed by § 6-5-574(a), either as set out in Ex parte Panell, 756 So.2d 862 (Ala.1999) (holding that the statutory limitations period begins to run from the date of the occurrence of the tortious act or omission), or as set out in Michael v. Beasley, 583 So.2d 245 (Ala.1991) (holding that the statutory limitations period begins to run from the date of the accrual of the action and not from the date of the occurrence of the act or omission), Coilplus’s action is untimely. The defendants further argue that even assuming that the six-month savings provision set forth in § 6-5-574(a) applies, Coilplus’s action is likewise untimely.
The defendants argue that Coilplus attempts to escape § 6-5-574 and caselaw addressing when a cause of action accrues in a legal-malpractice case by relying on cases that are inapplicable or distinguishable. Specifically, they argue that System *904 Dynamics and Griffin are not controlling because neither one involved the ALSLA. With regard to Coilplus’s fraud claim, the defendants argue that the claim is without merit because Coilplus failed to show that the fraud claim could come within the tolling provision of § 6-2-3 when the only facts alleged by Coilplus were, in essence, that Vann gave incorrect legal advice, and Coilplus alleged nothing to show an intentional suppression by Vann (i.e., that Vann intentionally gave Coilplus incorrect legal advice).

Discussion

There is only “one form and cause of action” that may be brought in Alabama against a legal-service provider, and that is a legal-service-liability action. § 6-5-573, Ala.Code 1975. Section 6-5-572, Ala.Code 1975, provides that
“[a] legal service liability action embraces all claims for injuries or damages or wrongful death whether in contract or in tort and whether based on an intentional or unintentional act or omission. A legal service[ ] liability action embraces any form of action in which a litigant may seek legal redress for a wrong or injury and every legal theory of recovery, whether common law or statutory, available to a litigant in a court in the State of Alabama now or in the future.”
This includes the multiple claims brought by Coilplus under the ALSLA.
Section 6-5-574, Ala.Code 1975, provides:
“(a) All legal service liability actions against a legal service provider must be commenced within two years after the act or omission or failure giving rise to the claim, and not afterwards; provided, that if the cause of action is not discovered and could not reasonably have been discovered within such period, then the action may be commenced within six months from the date of such discovery or the date of discovery of facts which would reasonably lead to such discovery, whichever is earlier; provided, further, that in no event may the action be commenced more than four years after such act or omission or failure; except, that an act or omission or failure giving rise to a claim which occurred before August 1, 1987, shall not in any event be barred until the expiration of one year from such date.
“(b) Subsection (a) of this section shall be subject to all existing provisions of law relating to the computation of statutory periods of limitations for the commencement of actions, namely, Sections 6-2-1, 6-2-2, 6-2-3, 6-2-5, 6-2-6, 6-2-8, 6-2-9, 6-2-10, 6-2-13, 6-2-15, 6-2-16, 6-2-17, 6-2-30, and 6-2-39; provided, that notwithstanding any provisions of such sections, no action shall be commenced more than four years after the act, omission, or failure complained of; except, that in the case of a minor under four years of age, such minor shall have until his or her eighth birthday to commence such action.”
In short, § 6-5-574(a) requires that a plaintiff commence a legal-malpractice action within two years after the act or omission or failure giving rise to the action. Section 6-5-574(b) subjects the two-year limitations period to other law relating to the computation of the statutory periods of limitations. Section 6-5-574(a) also provides for an ameliorative discovery period of six months from the date of discovery of the cause of action or the date of the discovery of facts that would reasonably lead to such discovery if the cause of action was not known to the plaintiff during the two-year period. Under § 6-5-574(a), there is a four-year absolute bar on all claims occurring on or after August 1, 1987.
*905 In the present case, Coilplus asserted five claims under the ALSLA against the defendants. Because Coilplus does not specifically address its breach-of-contract claim in its brief, this Court will not address it. See Tucker v. Cullman-Jefferson Counties Gas Dist., 864 So.2d 317 (Ala.2003) (holding that an appeals court will not discuss a matter on appeal unless presented and argued in brief). Under § 6-5-574(b), Coilplus’s fraud claim is subject to certain statutes regarding the computation of time for statute-of-limitations purposes, which we discuss later in the opinion. We will review the remainder of Coilplus’s claims (negligence, wantonness, and breach of a fiduciary duty) in light of the applicable statutory limitations period set forth in § 6-5-574 and relevant case-law interpreting the ALSLA.
In Denbo v. DeBray, 968 So.2d 983 (Ala.2006), this Court discussed the caselaw applying the “occurrence” test and the “damage” test in determining when the two-year statute of limitations in § 6-5-574 begins to run. In Denbo, a former client filed a legal-malpractice action against his attorney and the law firm that employed the attorney following litigation involving the client and the Environmental Protection Agency arising out of the client’s activities in disposing of hazardous waste. From the beginning of the litigation, the client provided the attorney with copies of certificates of insurance covering the challenged activities at the site and asked that the attorney notify the insurance companies of the litigation. From 1993 to 2000, the attorney and the law firm were actively engaged in the litigation and periodically billed the client for attorney fees and costs, which the client paid. The client repeatedly asked the attorney and the employees of the law firm if the insurance companies had been notified regarding the pending claims. The attorney assured the client that the insurance companies had been notified. In August 2000, the client agreed to settle the case based on advice from the attorney. In March 2002, the client was informed that the insurance companies had not been notified of the litigation in a timely manner and were not responsible for costs and attorney fees that had been incurred by the client without their consent. Because the insurance companies had not been notified of the claims at the commencement of the litigation, the companies refused to reimburse the client for the cost of the settlement or for the costs of litigation. The client filed a legal-malpractice claim based on the attorney’s failure to notify the insurance companies, which was deemed to have been filed on October 1, 2002.[2] The defendants moved for a summary judgment on the basis that the action was barred by the two-year statute of limitations in the ALSLA, which the trial court granted.
In Denbo, this Court discussed the two different approaches for determining when the statute of limitations begins to run, i.e., when a cause of action “accrues.” The Court discussed the “damage” rule in Floyd v. Massey & Stotser, P.C., 807 So.2d 508 (Ala.2001),[3] under wh ich the statute of limitations begins to run from the date that the client in the legal-malpractice action sustains an injury or damage. The Court also discussed Ex parte Panell, 756 So.2d 862 (Ala.1999) (a plurality opinion), and Ex parte Seabol, 782 So.2d 212 (Ala.2000), in which the Court relied on the *906 “occurrence” rule, which bases the running of the statute of limitations on the date the act or omission giving rise to the claim occurred and not when damage is first suffered. This Court in Denbo recognized the split of authority in legal-malpractice actions but did not elect to resolve the split. Instead, the Court held that under either the “damage” approach or the “occurrence” approach, the client’s complaint was untimely.
Under the “occurrence” rule, the Court in Denbo determined that the complaint was barred by the two-year statute of limitations because the attorney’s act or omission (i.e., the failure to timely notify the insurance companies) occurred more than two years before the filing of the action. The Court concluded that even though § 6-5-574(a) allows for a six-month grace period from the time of discovery if the cause of action is not, or could not reasonably be, discovered within the two-year period, the client was notified by the insurance companies in March 2002 that they had not been notified of the claims. Accordingly, the action, filed on October 1, 2002, was outside the six-month extension of time afforded by § 6-5-574(a). Under the “damage” approach, the Court concluded likewise that the claim was time-barred. The client’s damage, including the legal fees he had paid the attorney, in addition to the settlement amount, which the client contended would have been paid by the insurance companies if the companies had been properly notified of the claims, occurred more that two years before the filing of the legal-malpractice action.
The Denbo Court also held that the legal-malpractice claims were precluded by the absolute four-year bar of § 6-5-574(b) because both the attorney’s omission and the payment of legal fees occurred more than four years before the filing of the legal-malpractice action. The Court went on to discuss the client’s attempt to escape the time bar of the ALSLA by invoking the protection of § 6-2-3 as made available by § 6-5-574(b). The Court determined that, to the extent that § 6-2-3 was applicable, the client’s fraud claim was without merit because there had been no reasonable reliance.
As was the case in Denbo, there is no need in the present case for this Court to elect between the occurrence approach and the damage approach: Coilplus’s claims are untimely under either scenario. Under the occurrence approach discussed in Panell and Ex parte Seabol, the act or omission giving rise to the Coilplus’s claim was Vann’s opinion that the 1999 bonds qualified for tax-exempt status when they did not. That act occurred no later than February 25,1999, the date the 1999 bonds were issued. Coilplus filed its complaint on October 30, 2002, after the two-year statute of limitations had run. Assuming that the six-month savings provision of § 6-5-574(a) applies, Coilplus first had knowledge that the tax-exempt status of the 1999 bonds was questionable on July 16, 2001, when the IRS employee sent the e-mail addressing the tax-exempt status of the 1999 bonds or, at the latest, when Doss met with IRS employees, new counsel, and the bond trustee, among others, on August 2, 2001, to discuss the issue. Coilplus filed its complaint more than 6 months after August 2, 2001.
Coilplus’s claims are likewise time-barred under the damage approach recognized in Michael v. Beasley. In Michael, the Court held that a cause of action under the ALSLA accrues at the time the plaintiff first suffers legal injury or damage. In this case, Coilplus first suffered legal injury or damage when the 1999 bonds were sold as tax-exempt bonds on Febru *907 ary 25,1999, when those bonds did not and could not qualify for tax-exempt status.
Coilplus argues that its legal injury occurred in 2001 when the IRS notified Coil-plus that the 1999 bonds were not tax exempt, but its reliance on System Dynamics, supra, is misplaced. In System Dynamics, the chief executive officer (“the CEO”) of the corporation caused the corporation to make certain payments to him. The IRS later assessed a penalty against the corporation based on some of those payments, and the corporation sued the CEO. This Court held that there had been no completed wrong until the IRS assessed a penalty and that the statute of limitations did not begin to run until the IRS’s assessment. First, System Dynamics did not involve the ALSLA and the statutory requirements, including the statute of limitations, enacted by the legislature for legal-malpractice claims. Second, System Dynamics is factually distinguishable from the present case. In System Dynamics, this Court relied on the fact that the corporation did not know whether the IRS would allow the payments to the CEO as business deductions, would allow a portion of the payments, or would disallow all the payments. At best, there existed a potential tax liability and consequences when the payments were made to the CEO, and, in the end, the IRS disallowed only a portion of the payments. In other words, the payments were not improper because the corporation suffered no immediate harm as a result of the payments; it was only a later attempt to deduct those payments that resulted in a disallowance of some of the payments as business deductions. In the present case, Coilplus is alleging that the incorrect legal advice resulted in the issuance of bonds that were improper from their issuance and that the 1999 bonds would not have been issued but for Vann’s incorrect legal advice that the 1999 bonds were tax exempt.
Coilplus also relies on a toxic-tort case to support its argument that its cause of action did not accrue until a “manifest, present injury” had occurred and that Coilplus did not have a manifest, present injury until the IRS notified Coilplus that the 1999 bonds were not tax exempt. In Griffin v. Unocal Corp., supra, this Court held that in a toxic-substance-exposure case, a plaintiffs cause of action accrues only when there has occurred a manifest, present injury. It is clear that Griffin is factually distinguishable from this case because Griffin involved a claim that the plaintiffs decedent developed leukemia as a result of, but subsequent to, exposure to a certain toxic chemical while he was employed by the defendant; it did not involve a legal-malpractice claim. Also, in an appendix to Griffin,[4] Justice Harwood discussed the legislature’s right to prescribe different statutes of limitations for different actions, recognizing the ALSLA is one of those statutes:
“The proper construction of the term ‘accrued’ in § 6-2-30(a)[, Ala.Code 1975,] in the context of toxic-substance-exposure cases should honor the rule that a cause of action accrues only when there has occurred a manifest, present injury. I understand ‘manifest’ in this context to mean an injury manifested by observable signs or symptoms or the existence of which is medically identifiable. ‘Manifest’ in this sense does not mean that the injured person must be personally aware of the injury or must know its cause or origin. All that is required is that there be in fact a physi *908 cal injury manifested, even if the injured person is ignorant of it for some period after its development. This approach is mandated by the rule stated as early as Kelly v. Shropshire, 199 Ala. 602, 605, 75 So. 291, 292 (1917), and as late as Gilmore v. M & B Realty Co., LLC, 895 So.2d 200, 208 (Ala.2004), and on innumerable occasions in between, that ‘plaintiffs ignorance of the tort or injury, at least if there is no fraudulent concealment by defendant, [does not] postpone the running of the statute [of limitations] until the tort or injury is discovered.’ An oft-declared companion rule is that ‘this Court will not apply the discovery rule unless it is specifically prescribed by the Legislature.’ Travis v. Ziter, 681 So.2d 1348, 1354 (Ala.1996).
“We operate within our proper sphere when we undertake to determine the construction that should be ascribed to the legislatively prescribed term ‘accrued’ in § 6-2-30(a); we would operate outside that sphere were we to attempt to add to the text of § 6-2-30(a) so as to superimpose some sort of discovery feature. Thus, I reject the notion that our prior and present requirement of a ‘manifest,’ present injury means that the injury must be obvious to and known by the injured party. That would simply represent the creation of a type of discovery rule. I reaffirm that creation of a discovery rule lies within the province of the legislature, which is equipped to weigh the competing public-policy arguments and to fashion variations of discovery principles tailored to the particular nature of each affected cause of action. The legislature has shown its special capability in that regard by structuring variations of discovery features in the following statutes: § 6-2-3; § 6 — 2—30(b); § 6-5-482; § 6-5-502(b); § 6-5-57U(a); § 7-2A-506(2); § 8-19-14; § 8-26A-16(c); and § 8-27-5.”
990 So.2d at 310-11 (emphasis added).
With regard to Coilplus’s fraud claim, § 6-5-574(a) is “subject to all existing provisions of law relating to the computation of statutory periods of limitations for the commencement of actions,” including § 6-2-3. § 6-5-574(b). Section 6-2-3 is an accrual provision applicable to fraud claims and provides as follows:
“In actions seeking relief of the ground of fraud where the statute has created a bar, the claim must not be considered as having accrued until the discovery by the aggrieved party of the fact constituting the fraud, after which he must have two years within which to prosecute his action.”
Coilplus states that the e-mail from the IRS employee dated July 16, 2001, first put Coilplus on notice that the 1999 bonds may not have been tax exempt and that its action was filed on October 30, 2002. Coil-plus argues that this was well within the two-year limit for a fraudulent-suppression claim as set out in § 6-2-3 and within the four-year bar applicable to all claims brought under § 6-5-574(b). The defendants argue that Coilplus’s fraudulent-suppression claim is without merit.
Coilplus alleged in its complaint that the defendants suppressed material facts that they were under an obligation to communicate to Coilplus as its counsel; the facts allegedly suppressed were that the defendants:
“(a) failed to advise [Coilplus] that the 1999 Bonds would not, under the circumstances, qualify as a tax-exempt issue under Section 144 of the Code;
“(b) failed to advise [Coilplus] that [Coilplus] had to retire the 1984 Bond issue prior to the closing of the 1999 *909 Bonds, in order for the 1999 Bonds to qualify as tax-exempt;
“(c) failed to assure that the 1984 Bond issue was retired prior to the closing of the 1999 Bonds so that the aggregate principal amount of all bonds outstanding at such time did not exceed $10,000,000.00;
“(d) failed to advise [Coilplus] of the requirements for the qualification of the 1999 Bonds as tax-exempt; and
“(e) in general, failed to properly and professionally perform their duties as bond counsel and closing attorneys.”
Coilplus has the burden of proving that its fraud claim comes within the tolling provision of § 6-2-3. See Ex parte Seabol, 782 So.2d at 215 (“[U]nder § 6-5-574(b), a legal malpractice action based on allegations of fraud must be commenced within two years after the discovery by the aggrieved party of the fact constituting the fraud; provided, however, that no action may be commenced more than four years after the act or acts constituting fraud. The burden is on the plaintiff to show that he comes within the § 6-2-3 tolling provision.”).
Assuming that Coilplus met its burden of showing that its fraud claim came within the tolling provision, it has not met the elements of fraudulent suppression, which are: (1) the defendant had a duty to disclose an existing material fact; (2) the defendant concealed or suppressed that material fact; (3) the defendant’s suppression induced the plaintiff to act or refrain from acting; and (4) the plaintiff suffered actual damage as a proximate result. Freightliner, LLC v. Whatley Contract Carriers, LLC, 932 So.2d 883, 891 (Ala.2005). “ ‘[A]n action for suppression will lie only if the defendant actually knows the fact alleged to be suppressed.’ ” Cook’s Pest Control, Inc. v. Rebar, 28 So.3d 716, 726 (Ala.2009) (quoting McGarry v. Flournoy, 624 So.2d 1359, 1362 (Ala.1993)). In the present case, nothing in Coilplus’s complaint alleges that Vann, at the time the 1999 bonds were issued, knew that the bonds were taxable, yet intentionally issued a legal opinion stating that the 1999 bonds were tax exempt. There has been no allegation that Vann knew that the 1999 bonds were taxable when he advised Coilplus that the bonds would be tax exempt. Therefore, Coilplus’s suppression claim fails.

Conclusion

Because Coilplus’s legal-malpractice action is time-barred under all applicable provisions of § 6-5-574, regardless of whether the “occurrence” approach or the “damage” approach is used to determine when that action accrued, and because Coilplus failed to present any evidence to support a claim of fraudulent suppression, we affirm the trial court’s summary judgment in favor of the defendants.
AFFIRMED.
COBB, C.J., and LYONS, STUART, and MURDOCK, JJ., concur.

. Coilplus does not address its breach-of-contract claim in its brief to this Court; therefore, we will not address it.

. The client filed his action on March 26, 2003, but pursuant to a “tolling agreement” between the parties, the action was deemed to have been filed on October 1, 2002.

. Floyd v. Massey & Stotser relied in part upon Michael v. Beasley, 583 So.2d 245 (Ala.1991).

. In Unocal, this Court adopted Justice Har-wood's dissent in Cline v. Ashland, Inc., 970 So.2d 755 (Ala.2007), as the opinion of the Court in Griffin and attached the dissent as an appendix.