MALONE, Chief Justice.
Alabama Psychiatric Services, P.C. (“APS”), appeals from a summary judgment entered by the Lauderdale Circuit Court in favor of 412 South Court Street, LLC (“Court Street”). We reverse and remand.

Facts

The evidence in the record, either undisputed or viewed in the light most favorable to APS, is substantially as follows.[1] In May 2005, SRS Group, LLC, which was owned by Eugene Sak, acquired a building at 412 South Court Street in Florence (“the building”). Subsequently, Sak began substantial renovations to the building, including gutting and rebuilding the interior of the structure.
The building had two entrances. The main entrance to the building was in the rear of the building, adjacent to a parking lot that was used by employees and clients of the tenants of the building. In addition, the building had an entrance in front, but the front entrance was difficult to access from the parking lot. The route from the parking lot to the front entrance required one to walk around one side of the building across property belonging to a gas station and then to jump from a retaining wall. Alternatively, one could walk around the other side of the building from the parking lot to the front entrance, across property belonging to a hotel, along a route that several witnesses described as unsafe and “dangerous.” Sak testified that he personally used the entrance in the rear of the building because “the parking lot is oriented to that area ... so it would make common sense to use that as an entrance.”
In May 2006, Sak entered into negotiations with Make Believe, LLC, to lease space in the building for use as a gym and exercise facility. They reached an agreement pursuant to which Make Believe would lease the first and second floors of the building, including the first and second floors of an addition that would subsequently be built onto the main entrance in the rear of the building. According to Sak, he and Make Believe negotiated Make Believe’s entire lease for all this space at one time, before Make Believe took occupancy. Make Believe took occupancy of the first and second floors of the building in December 2006, and by January 2007 it had begun operating a gym known as the Metro Athletic Club or “the MAC.” According to Sak, in January 2007, all of Make Believe’s rental space *1242 was physically completed except for that portion of Make Believe’s leased space that would be located in the addition.
In May 2006, while he was negotiating with Make Believe, Sak entered into discussions with APS about leasing office space in the building. Sak knew that APS would be leasing the space to provide psychiatric and mental-health-counseling services to patients.
During the negotiations with Sak for the space APS was considering leasing, Doyle Stewart, APS’s chief financial officer, and other officers and employees of APS asked Sak for information about the other tenants in the building, including the MAC. Stewart thought it unusual that a gym would be operating in a professional building. According to Stewart, in answer to his inquiries about the MAC, Sak portrayed the MAC as a small, expensive gym with “not a significant membership load.” During the ongoing negotiations between APS and Sak, the entrance to the MAC was located directly behind the elevators in what was then the main entrance area of the building. According to Stewart, he noted at that time that the entrance to the MAC and the gym facility itself were located so that they “would not cause a problem for anybody that wanted to go into the upper floors of the building. It was kind of off to itself.”
During his deposition, Stewart testified that, during the course of the lease negotiations, he “spent a lot of time” explaining to Sak that “a lot of [APS’s patients] are VIP-type people ... leaders in the community that come in for psychiatric services, and we have to keep their business, basically, confidential ... and private to the best extent that we can.” Stewart and other representatives of APS informed Sak that APS’s clients were psychiatric patients and that those clients would need to be able to enter the building and pass through the common areas with sufficient privacy that their destination at APS’s offices was not readily obvious to bystanders.
Stewart knew that Sak was planning to build an addition to the building at the main entrance. During the negotiations, Stewart inquired as to Sak’s plans for the addition. In response to those inquiries and to the inquiries of other APS personnel, Sak represented that the addition would include an atrium with a sitting area and a fountain accessible by a walled-in hallway. Sak represented to APS that the walled-in hallway would lead from the door of the main entrance to the building elevators, which could be used to access the various tenant spaces on the several floors of the building. Sak represented that the enclosed hallway would contain a directory or directions to the various tenant spaces in the building. At no point in response to APS’s repeated inquiries did Sak represent that Make Believe would be leasing space in the addition for use as a gym or that, when the addition was finished, APS’s patients would have to walk through Make Believe’s gym to access the elevators to reach APS’s offices.
During the negotiations, Mary Brown, an office manager for APS, told Sak that she was concerned about having a discreet entrance for APS’s clients and about potential noise from a gym facility in the building and that there would not be sufficient parking for APS patients and staff because of the use of the parking lot by members of the gym. Sak assured Brown that the noise problem would be solved with extra insulation, that parking would be sufficient for both the gym members and APS, that he would assign APS 30 of the 120 available parking spaces if necessary, and that, when construction of the addition was complete, the gym would have its own separate entrance. Sak also *1243 assured Brown that the addition would house an atrium or other common areas and that the entrance to the building in the addition would lead into an enclosed common hallway that led to the building elevators.
Stewart and Brown both believed Sak’s representations that the addition would include a main entrance into an enclosed hallway that led to the building elevators, and they both thought that this would provide a sufficiently discreet entrance for APS’s clients. They both were involved in the lease negotiations between APS and Sak, and they testified that, had APS known that the entrance to the addition would be into an open gymnasium through which APS’s clients would have to walk to reach the elevators, they would not have signed a lease agreement for the property because such an entrance would not be sufficiently discreet or adequate for psychiatric patients who had to access the elevators to get to APS’s office space on the third floor.
On October 19, 2006, APS entered into a lease agreement with SRS Group, LLC, pursuant to which APS agreed to lease office space on the third floor of the building. After October 19, 2006, Stewart, Brown, and APS continued to ask Sak for specifics about the plans for the addition. Sak continued to represent that the addition would include a walled hallway from the main entrance to the elevators with space for common use on either side and that APS would be satisfied with the main entrance after the addition was complete.
Sometime in 2007, the building was sold to Court Street, of which Sak was a member. On May 31, 2007, Court Street and APS executed a five-year lease agreement for the third floor of the building. The May 31, 2007, lease agreement stated that it “st[ood] as an amendment to and replacement of’ the October 19, 2006, lease agreement that named SRS Group as landlord.
Although the renovation construction was not yet complete, Sak asked APS if it would be willing to move into its office space early so that he would be able to obtain financing to complete the renovations. APS complied and took possession of the leased space in June 2007. Construction on the addition started in August 2007. From time to time during construction, Sak represented to APS that he was changing the details of his plans for the addition or that the plans were not complete or definite. However, in response to repeated inquiries from APS, he always represented that the addition would consist of an enclosed hallway leading from the main entrance of the building to the elevators, with some type of common area off to the side of the enclosed hallway. Sak also continued to represent that the new entrance would be adequate and appropriate for use by APS’s clients.
In September or October 2007, the new addition was completed. Make Believe moved into the new addition pursuant to its lease and began operating a Gold’s Gym franchise in the space. The Gold’s Gym facility was not a small, exclusive gym for professionals. It had many more customers than the MAC, and the customers made more noise and used more parking spaces than had the MAC’S members. As a result, the clients of APS had difficulty finding available parking spaces. The noise from the gym interfered with APS’s business. For example, noise and vibrations caused by activities in the gym would regularly cause coffee cups to shake in APS’s office space. At one point, an APS patient thought she was having a psychotic episode and that she was hearing noises that did not exist, but APS professionals, with some difficulty, were able to reassure her that she was not having a psychotic *1244 episode and that she was in fact hearing actual noises that were coming from the gym.
It was not until the addition was complete and Make Believe began operating a Gold’s Gym franchise in it that APS discovered that Make Believe would occupy the addition and that APS’s clients entering the building at the main entrance would have to traverse an open walkway through the Gold’s Gym facility to access the elevators to APS’s offices. The addition did not have an enclosed hallway. The main entrance to the building through the addition appeared from the outside to be nothing more than an entrance to the Gold’s Gym facility. Clients of APS had difficulty finding their way to APS’s office because they did not recognize the Gold’s Gym entrance as a common entrance to the building. Further, because the addition did not contain an enclosed hallway, once patients of APS entered the building they had to walk through the Gold’s Gym facility along an open walkway to the elevators. On either side of the walkway, members of Gold’s Gym were exercising and using tanning beds. Members of Gold’s Gym who were exercising at various places throughout the new addition could easily view APS’s clients as they walked to the elevators. One witness described the walkway through the addition from the entrance to the elevators as follows:
“There may be some railings in there [along the walkway from the main entrance to the elevator], but everything is wide open. I mean, you can see. You know, you can see everything going on in the gym. As a matter of fact, the gym people lookfed] at you when you walked in. I noticed that, which is kind of uncomfortable, but you know, they are there doing their bikes and stuff, facing the — path to the elevator.
“There really is, I mean, the whole thing is the gym. I mean, everything. The left side, everything over there is on the gym. The right, everything is on the gym. The receptionist’s desk [for Gold’s Gym] is right there when you walk in the door. I mean, the whole thing is the gym.”
Further, employees of Gold’s Gym would sometimes stop APS’s clients in front of people in the gym and demand to know where they were going. The APS patients would inform them that they were in the building for an appointment at APS, and the gym staff would then direct them to the elevators. APS, through Sak, asked the Gold’s Gym employees to stop accosting visitors to the building and demanding to know where they were going, and to simply direct persons who were not clientele of Gold’s Gym to the elevator. Stewart testified that the manager of Gold’s Gym responded that he could not “staff the front to be a reception area” for everyone entering the building, and the manager complained to APS that he “was tired of [APS’s] crazy patients walking through his gym.”
APS presented evidence indicating that its patients were embarrassed and humiliated because they had to walk through the gym, where they could possibly be seen by family, friends, and coworkers; that many patients refused to come back to the building after having to walk through the gym to reach APS’s offices; and that new patients refused to make appointments when they learned that the office was in a building occupied by Gold’s Gym and that they would have to walk through the gym to reach APS’s offices.
When asked in a deposition whether APS’s clients could have used the front entrance to the building, Stewart explained that there were no available parking spaces from which the front entrance was *1245 accessible. Stewart stated that that he could not ask psychiatric patients to “jump off a retaining wall” or walk through a dangerous alley as would be required to access the front entrance from the parking area in the rear of the building. Stewart testified that the front entrance was occasionally locked or under construction. Stewart stated:
“You know, psychiatric patients run from very mild to very, very sick. And, you know, they have all kinds of things, become paranoid about stuff and things, and having them walking around an alley [to access the front entrance from the parking lot] is not — not—will not work. That is just not going to work, and, as a matter of fact, it’s inappropriate for anybody to have to walk down an alley to get to the front door of a Class A office building.”
On January 22, 2008, APS sent Sak a letter stating:
“Be advised that [APS] has determined that you are currently in default of your obligation to [APS] as set forth in our Lease executed May 31, 2007. Accordingly, pursuant to paragraph 18.1 of the lease, i.e., Notice of Landlord’s Default, [2] this letter is written notice of our intent to terminate the Lease. The reasons for our actions include, but are not necessarily limited to, your failure to provide unimpeded confidential access to the office space; your authorization, facilitation or operation of a business which operates as a nuisance to our leased space; and your failure to provide adequate on site parking for our personnel and patients. For these reasons, your acts and/or omissions constitute a breach of your covenant not to interfere in our quiet enjoyment of the leased property. Accordingly, we request that you undertake all obligations required by you as set forth in the Lease agreement.”
On February 5, 2008, APS entered into a lease agreement for office space in another building. On February 11, 2008, counsel for Court Street sent a letter to counsel for APS denying that Court Street was in breach of the lease agreement. On March 24, 2008, counsel for Court Street sent another letter to counsel for APS, detailing the steps Court Street was taking to address APS’s concerns, which included ordering “[architecturally designed fabric shields ... to block patrons view from adjoining tenant space.” However, the letter also stated that Court Street still denied that it was in breach of the lease agreement.
On March 31, 2008, APS gave Court Street notice that it was vacating the premises effective April 1, 2008, and returned the keys to its offices to Sak.

Procedural History

On April 21, 2008 Court Street sued APS, alleging breach of the contract and seeking all rents due under the lease agreement. According to Court Street, APS breached the terms of the lease agreement when it vacated the premises and ceased paying rent without giving Court Street 90 days’ written notice of default and an opportunity to cure any alleged default.
On May 20, 2008, APS filed an answer and counterclaim, in which it asserted that *1246 Court Street was in breach of the lease agreement because, APS alleged, Court Street interfered with APS’s beneficial use and quiet enjoyment of the premises in violation of the terms of the lease agreement, and in doing so had breached an implied warranty of quiet enjoyment. APS also claimed that it had been fraudulently induced into entering into the lease agreement by Court Street’s representations that the premises would be appropriate and satisfactory for APS’s psychiatric practice; that, at the time it made the representations, Court Street knew that the representations were false and knew that the addition would house an exercise facility in such a manner as would interfere with APS’s use of its leased space; that Court Street had suppressed information regarding a future tenant; and that Court Street’s false representations and suppression of material information were willful, fraudulent, deceptive, and made to induce it into executing the lease agreement. APS sought an order rescinding and canceling the lease, compensatory damages, and punitive damages.
On August 6, 2010, Court Street filed a motion for a summary judgment as to all claims. On August 30, 2010, APS filed a response to Court Street’s summary-judgment motion and a cross-motion for a summary judgment. On September 7, 2010, the trial court granted Court Street’s motion for a summary judgment and entered a judgment against APS in the amount of $436,502.26. On October 5, 2010, APS filed a notice of appeal.

Standard of Review

“This Court’s review of a summary judgment is de novo. Williams v. State Farm Mut. Auto. Ins. Co., 886 So.2d 72, 74 (Ala.2003). We apply the same standard of review as the trial court applied. Specifically, we must determine whether the movant has made a prima facie showing that no genuine issue of material fact exists and that the movant is entitled to a judgment as a matter of law. Rule 56(c), Ala. R. Civ. P.; Blue Cross & Blue Shield of Alabama v. Hodurski, 899 So.2d 949, 952-53 (Ala.2004). In making such a determination, we must review the evidence in the light most favorable to the non-movant. Wilson v. Brown, 496 So.2d 756, 758 (Ala.1986). Once the movant makes a prima facie showing that there is no genuine issue of material fact, the burden then shifts to the nonmovant to produce ‘substantial evidence’ as to the existence of a genuine issue of material fact. Bass v. SouthTrust Bank of Baldwin County, 538 So.2d 794, 797-98 (Ala.1989); Ala.Code 1975, § 12-21-12.”
Dow v. Alabama Democratic Party, 897 So.2d 1035, 1038 (Ala.2004).

Discussion

On appeal, APS argues that the trial court erred by entering a summary judgment for Court Street. Specifically, APS contends that it was fraudulently induced to sign a lease agreement for space in the building. APS argues that the record contains substantial evidence creating a genuine issue of material fact as to whether Court Street knowingly misrepresented to APS that the addition would be built as a common area with a sufficiently discreet and appropriate main entrance to the building for APS’s clients while suppressing the fact that the space in the addition had already been leased to Make Believe for use as a gym.
APS argues that the summary judgment was inappropriate because, APS contends, the record contains substantial evidence to support its claim that Sak fraudulently induced it to enter into the May 31, 2007, lease agreement with Court *1247 Street by misrepresenting and suppressing material information.
 The elements of fraudulent misrepresentation are: “ ‘(1) [a] false representation (2) of a material existing fact (3) relied upon by the plaintiff (4) who was damaged as a proximate result of the misrepresentation. Earnest v. Pritchett-Moore, Inc., 401 So.2d 752 (Ala.1981).”’ Pranzo v. ITEC, Inc., 521 So.2d 983, 984 (Ala.1988) (quoting Coastal Concrete Co. v. Patterson, 503 So.2d 824, 826 (Ala.1987)). When, as in this case, “ ‘fraud is based upon a promise to perform or abstain from performing in the future, two additional elements must be proved: (1) the defendant’s intention, at the time of the alleged misrepresentation, not to do the act promised, coupled with (2) an intent to deceive. Clanton v. Bains Oil Co., 417 So.2d 149 (Ala.1982).’ ” Pranzo, 521 So.2d at 983 (quoting Coastal Concrete, 503 So.2d at 826).
The elements of fraudulent suppression are: “(1) the defendant had a duty to disclose an existing material fact; (2) the defendant concealed or suppressed that material fact; (3) the defendant’s suppression induced the plaintiff to act or refrain from acting; and (4) the plaintiff suffered actual damage as a proximate result. Freightliner, LLC v. Whatley Contract Carriers, LLC, 932 So.2d 883, 891 (Ala.2005).” Coilplus-Alabama, Inc. v. Vann, 53 So.3d 898, 909 (Ala.2010). “ ‘[A]n action for suppression will lie only if the defendant actually knows the fact alleged to be suppressed.’ ” Cook’s Pest Control, Inc. v. Rebar, 28 So.3d 716, 726 (Ala.2009) (quoting McGarry v. Flournoy, 624 So.2d 1359, 1362 (Ala.1993)).
The record contains evidence indicating that in May 2006 Sak began negotiations with Make Believe to lease space in the building to be used by Make Believe as a gym; that the lease agreement included an agreement whereby Make Believe would lease not only space in the existing building but also space in an addition that would be built onto the then existing main entrance to the building; and that SRS Group and Make Believe entered into a lease agreement for all this space at one time, before Make Believe took occupancy of the building in December 2006. One could reasonably conclude from this evidence that Sak, who was a principal in SRS Group and in Court Street, knew at least by December 2006 that Make Believe would be leasing the addition and would be operating a gym in it. See Coilplus-Ala-bama, 53 So.3d at 909 (“ ‘ “An action for suppression will lie only if the defendant actually knows the fact alleged to be suppressed.” ’ Cook’s Pest Control, Inc. v. Rebar, 28 So.3d 716, 726 (Ala.2009) (quoting McGarry v. Flournoy, 624 So.2d 1359, 1362 (Ala.1993)).”).
According to the depositions of several witnesses, APS communicated to Sak the importance to APS of a discreet entrance, as well as the importance of maintaining a reasonable degree of privacy for its clients. The record contains evidence indicating that, on multiple occasions both before and after December 2006 when Make Believe moved into the building, and before APS entered into its May 31, 2007, lease agreement with Court Street, APS asked Sak to explain his plans for the addition to the main entrance. See Mason v. Chrysler Corp., 653 So.2d 951, 954 (Ala.1995) (“A duty to communicate can arise from a confidential relationship between the plaintiff and the defendant, from the particular circumstances of the case, or from a request for information, but mere silence in the absence of a duty to disclose is not fraudulent.” (emphasis added)).
The record contains evidence to support the conclusion that, in response to repeated inquiries from APS, Sak represent *1248 ed that the addition to the main entrance would include a discreet entrance that would be appropriate for use by APS’s clients and that this entrance would consist of an enclosed hallway leading to the elevators, with spaces for common use on either side of the hallway. However, the evidence also demonstrates that, before he made these representations to APS, Sak knew that the space in the addition had already been leased to Make Believe for the purpose of operating a gym. Thus, one could reasonably conclude from the evidence that, at the time he made representations to APS regarding the nature of the addition, Sak in fact had no intention of building an addition that consisted of a main entrance into a walled-in hallway to the elevators with doorways to common areas opening off the hallway on either side. See Hillcrest Ctr., Inc. v. Rone, 711 So.2d 901, 906 (Ala.1997) (holding that, for an action for fraudulent misrepresentation to lie “ ‘[w]here the misrepresentation relates to some future event, it must be shown that the person making the representation intended not to do the act promised at the time the misrepresentation was made.’ ” (quoting Russellville Prod. Credit Ass’n v. Frost, 484 So.2d 1084, 1087 (Ala.1986))).
The record contains evidence indicating that, to conduct its business as a psychiatric practice, APS required a building entrance that was usable by psychiatric and mental-health patients and that was sufficiently discreet that clients of APS could not be readily identified as psychiatric patients as they entered the building. The evidence also indicates that APS made these needs known to Sak. The record contains evidence indicating that, contrary to Sak’s representations to APS, both floors of the addition had been leased by Make Believe and the addition did not contain common space on either side of a walled-in hallway leading from the main entrance to the elevators. See Pranzo, supra (holding that a claim of fraudulent misrepresentation requires proof that the defendant misrepresented a material fact); and Coilplus-Alabama, supra (holding that a claim of fraudulent suppression requires proof that the defendant suppressed a material fact).
The record contains evidence indicating that the addition, which was a gym and did not have common space on either side of a walled-in hallway, did not have an entrance that was usable by APS’s clients and was not sufficiently discreet for APS’s clients. As a result, according to witnesses for APS, APS lost clients and revenue because its patients refused to keep appointments when they learned they had to walk through the gym to reach APS’s offices. See Pranzo, supra (holding that a claim of fraudulent misrepresentation requires proof that the plaintiff suffered damage as a result of reliance on the misrepresentation); and Coilplus-Alabama, supra (holding that a claim of fraudulent suppression requires proof that the plaintiff suffered damage as a proximate result of the suppression).
The record contains the depositions of two witnesses who testified as representatives of APS, and who both testified that APS would not have entered into the May 31, 2007, lease agreement with Court Street if it had known that, instead of common space and a walled hallway connecting the main entrance to the elevators, Sak intended, in constructing the addition, to construct space that Make Believe had already leased for use as a gym. See Pranzo, supra (holding that a claim of fraudulent misrepresentation requires proof that the plaintiff relied on the misrepresentation); and Coilplus-Alabama, supra (holding that a claim of fraudulent suppression requires proof that the plain *1249 tiff acted or failed to act as a result of the suppression).
Thus, the record contains substantial evidence to support APS’s claim that there exists a genuine issue of material fact as to whether, through misrepresentation and the suppression of material facts, Sak fraudulently induced APS to enter into the May 31, 2007, lease agreement. Accordingly, the trial court erred in entering a summary judgment for Court Street on APS’s counterclaim of fraudulent inducement.
Court Street apparently takes the position that, because APS entered into a lease agreement with SRS Group on October 19, 2006, any fraudulent misrepresentations or suppression of information that may have occurred after October 19, 2006, could not have proximately caused APS any harm, because APS had already entered into the lease agreement.
The record does not contain evidence of the terms of the agreement by which SRS Group transferred its interest in the building to Court Street. The record also does not contain a copy of the October 19, 2006, lease agreement between APS and SRS Group. It is undisputed that APS and Court Street entered into a separate lease agreement on May 31, 2007, a copy of which is contained in the record. Sak testified that the May 31, 2007,' lease agreement between APS and Court Street was “the same lease” as the October 19, 2006, lease, but with a change in the name of the landlord. This Court notes that the May 31, 2007, lease provides that the “[landlord may assign all of its right, title, and interest under this lease upon thirty (30) days notice to [tjenant.”
In sum, the record contains no substantial evidence, and the parties presented no argument, as to whether APS would have been bound by the October 19, 2006, lease agreement after SRS Group sold its interest in the building to Court Street, regardless of whether APS had entered into a separate lease agreement with Court Street on May 31, 2007. Therefore, summary judgment is not appropriate on the basis of Court Street’s implied argument that any fraudulent misrepresentation or suppression that occurred after October 19, 2006, could not have proximately caused APS any harm. See Liberty Nat’l Life Ins. Co. v. University of Alabama Health Sens. Found., P.C., 881 So.2d 1013, 1020 (Ala.2003) (“[T]his Court will affirm the trial court on any valid legal ground presented by the record, regardless of whether that ground was considered ... by the trial court. Ex parte Ryals, 773 So.2d 1011 (Ala.2000), citing Ex parte Wiginton, 743 So.2d 1071 (Ala.1999), and Smith v. Equifax Sens., Inc., 537 So.2d 463 (Ala.1988). This rule fails in application only where due-process constraints require some notice at the trial level, which was omitted, of the basis that would otherwise support an affirmance, such as ... where a summary-judgment movant has not asserted before the trial court a failure of the nonmovant’s evidence on an element of a claim or defense and therefore has not shifted the burden of producing substantial evidence in support of that element, Rector v. Better Houses, Inc., 820 So.2d 75, 80 (Ala.2001) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), and Kennedy v. Western Sizzlin Corp., 857 So.2d 71 (Ala.2003)).” (emphasis added)).

Conclusion

For the reasons stated above, we reverse the judgment of the trial court and remand the case for further proceedings consistent with this opinion.
REVERSED AND REMANDED.
*1250 WOODALL, STUART, PARKER, and MAIN, JJ., concur.
MURDOCK and SHAW, JJ., concur in the result.
WISE, J., recuses herself.

. This is an appeal from a summary judgment. Therefore, where the evidence in the record is conflicting, we have set forth the facts in the light most favorable to APS. See Dow v. Alabama Democratic Party, 897 So.2d 1035, 1038 (Ala.2004) (noting that, in reviewing a summary judgment, the Supreme Court "must review the evidence in the light most favorable to the nonmovant”).

. Paragraph 18.1 of the May 31, 2007, lease agreement between Court Street and APS states:
“In the event of any alleged default in the obligations of Landlord under this Lease, Tenant will deliver to Landlord written notice to cure such alleged default or, in the event the alleged default cannot reasonably be cured within a 30-day period, to commence action and proceed diligently to cure such alleged default.”