**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 20-3427
_____

SLF HOLDINGS, LLC,
                                        Appellant

v.

UNITI FIBER HOLDINGS, INC.; UNITI GROUP, INC.; KENNETH GUNDERMAN;
JOHN FLETCHER
_____

Appeal from the United States District Court
for the District of Delaware
(Civ. No. 1:19-cv-01813)
District Judge: Honorable Leonard P. Stark[1]
_____

Submitted Pursuant to Third Circuit LAR 34.1(a)
December 13, 2021
_____

Before:  GREENAWAY, JR., KRAUSE, and PHIPPS, *Circuit Judges*,

(Opinion Filed: August 17, 2022)

_____

OPINION*
_____

_____

[1] Effective March 16, 2022, Judge Stark was elevated to the Federal Circuit.

* This disposition is not an opinion of the full Court and, pursuant to I.O.P. 5.7, does not constitute binding precedent.

GREENAWAY, JR., *Circuit Judge*.

SLF Holdings, LLC ("SLF" or "Appellant") commenced this securities fraud suit against Uniti Fiber Holdings, Inc., Uniti Group, Inc.,[2] Kenneth Gunderman, and John P. Fletcher (collectively, "Appellees"). On appeal, SLF challenges the District Court's dismissal of its state law claims, arguing that the District Court failed to conduct an independent and thorough analysis pursuant to Alabama law. We will affirm the District Court's ruling. SLF has not demonstrated that Appellees made actionable omissions or misrepresentations under Alabama law.

## I.    BACKGROUND

### A.    Uniti Spinoff

In March 2015, Windstream Holdings, Inc. ("Windstream Holdings"), a publicly traded, telecommunications holding company, spun off one of its subsidiaries to form Uniti, a separate, publicly traded, telecommunications real estate investment trust ("REIT").[3] As part of this transaction, one of Windstream Holdings' subsidiaries, Windstream Services LLC ("Windstream Services"),[4] which is also a telecommunications holding company, conveyed its fiber and copper network assets to

---

[2] Unless otherwise noted, "Uniti" will be used to refer to Defendants-Appellees Uniti Fiber Holdings, Inc. and Uniti Group, Inc.

[3] To qualify as a REIT, a company must invest a significant portion of its assets in real estate and derive a significant portion of its gross income from real estate.

[4] Unless otherwise noted, "Windstream" will be used to refer to both Windstream Holdings and Windstream Services.

Uniti. Ultimately, in April 2015, Uniti leased its fiber and copper network to Windstream Holdings via a master lease (the "Master Lease").

During the spinoff and Master Lease negotiations, Uniti consulted outside legal counsel, Skadden, Arps, Slate, Meagher & Flom ("Skadden"). Skadden provided an analysis about the Master Lease and opined about the viability of Uniti leasing its fiber and copper network to Windstream Holdings. Although Skadden concluded that the Master Lease was a "true lease,"[5] JA94 ¶ 85, it flagged that "the IRS 'may argue that the proposed lease is merely a financing arrangement and that the purported lessor[, Uniti] is, in substance, a secured creditor but holds no equity interest in the property.'" *Id.* Skadden's opinion relied on projections from Ernst & Young LLP, which Windstream consulted to provide an independent appraisal of the useful life of the copper network.

In addition, at the time that the Master Lease was entered, a financial instrument governed at least $700 million of Windstream's outstanding notes (the "Indenture"). The Indenture contained restrictive covenants, limiting the types of transaction that Windstream could enter. As relevant here, Windstream was subject to a sale and leaseback bar, which stated that it "shall not, and shall not permit any of its Restricted Subsidiaries to, enter into any Sale and Leaseback Transaction."[6] JA79 ¶ 44.

---

[5] For Uniti to qualify as a REIT for tax purposes, the Master Lease had to be characterized as a "true lease." JA 72 ¶ 26.

[6] The Indenture defined a "Sale and Leaseback Transaction" as a "transaction involving any of the assets or properties of such Person whether now owned or hereafter acquired, whereby such Person sells or otherwise transfers such assets or properties and then or thereafter leases such assets or properties or any part thereof or any other assets or

## B.     SLF Transaction

In October 2016, Uniti met with SLF to discuss a potential acquisition of Southern Light, SLF's fiber optic network.  SLF alleges that Appellees made misleading statements at this meeting concerning: (1) Uniti's status as a REIT; (2) the favorable nature of the Master Lease; (3) Windstream's status as a stable lessee and thus, Uniti's ability to provide "iron-clad" dividends; and (4) Uniti's receipt of required consent to acquire SLF's copper network.

In July 2017, Uniti purchased SLF's fiber optic network for $700 million.  The sale was structured so that Uniti paid SLF $65 million in Uniti stock equivalents.  The remaining $635 million was paid in cash.

## C.     Windstream Litigation and Bankruptcy

A few months later, in October 2017, the hedge fund Aurelius Capital Master, Ltd. sued Windstream, alleging that the Master Lease violated Windstream Services' Indenture.  A District Judge in the Southern District of New York agreed and declared over $300 million of Windstream's notes immediately due and payable.

Two years later, in February 2019, Windstream filed for bankruptcy.  As part of the bankruptcy proceeding, Windstream sued Uniti and sought a declaration stating that the Master Lease was not a "true lease," but instead a financing agreement.  Windstream

properties which such Person intends to use for substantially the same purpose or purposes as the assets or properties sold or transferred."  JA79 ¶ 45.

also alleged that Uniti failed to obtain its consent in purchasing the fiber optic network from SLF.  The parties eventually settled these claims in March 2020.

### D.    Procedural Background

On July 3, 2019, SLF filed this action in the Southern District of Alabama against Uniti, Kenneth Gunderman (an outside financial adviser who developed the idea for a spinoff and later became Uniti's President and CEO), and John P. Fletcher (Windstream's General Counsel who provided legal and regulatory advice for the spinoff).  SLF alleged violations of federal securities laws and the Alabama Securities Act.  It also alleged Alabama common law claims for fraudulent inducement and civil conspiracy.  Lastly, SLF sought a declaratory judgment that Uniti was required to indemnify it for making misrepresentations in the Purchase Agreement.

Subsequently, the Alabama District Court transferred the case to the District of Delaware.  Appellees then filed a motion to dismiss, which the District Court granted.  Importantly, the District Court concluded that SLF's alleged omissions and misrepresentations were not actionable under both federal and Alabama law.

On appeal, SLF argues that the District Court erred by dismissing SLF's state law claims.  It does not challenge the District Court's ruling as to its claims arising under federal securities law.  Instead, SLF contends that the District Court erred by failing to "thoroughly and separately analyz[e] the distinct features and requirements of Alabama law."  Appellant's Br. at 4.  SLF further argues that the District Court "erred in failing to view the allegations in the light most favorable to" it.  *Id.*

5

## II. JURISDICTION AND STANDARD OF REVIEW

The District Court had jurisdiction pursuant to 28 U.S.C. § 1332. We have jurisdiction pursuant to 28 U.S.C. § 1291.

We review "a district court's decision granting a party's motion to dismiss *de novo*." *Buck v. Hampton Twp. Sch. Dist.*, 452 F.3d 256, 260 (3d Cir. 2006). In doing so, we must "accept all factual allegations in the complaint as true and view them in the light most favorable to the plaintiff." *Id.* We cannot "dismiss a complaint for failure to state a claim upon which relief can be granted unless we find that the plaintiff can prove no set of facts that would entitle her to relief." *Id.*

## III. DISCUSSION

### A. Fraudulent Inducement

#### 1. By Suppression

Pursuant to Alabama securities law, to successfully plead a fraudulent inducement by suppression claim, a plaintiff must plead that "(1) the defendant had a duty to disclose an existing material fact; (2) the defendant concealed or suppressed that material fact; (3) the defendant's suppression induced the plaintiff to act or refrain from acting; and (4) the plaintiff suffered actual damage as a proximate result." *Ala. Psych. Servs., P.C. v. 412 S. Ct. St., LLC*, 81 So. 3d 1239, 1247 (Ala. 2011) (citations omitted).

The Alabama Supreme Court has explained that in the context of "a commercial transaction involving arm's length negotiations, the parties have no general obligation to disclose any specific information to the other, but each has an affirmative duty to respond truthfully and accurately to direct questions from the other." *CNH Am., LLC v. Ligon*

6

*Cap., LLC*, 160 So. 3d 1195, 1201 (Ala. 2013) (citation omitted).  However, "once a party elects to speak, he or she assumes a duty not to suppress or conceal those facts that materially qualify the facts already stated." *Freightliner, L.L.C. v. Whatley Cont. Carriers, L.L.C.*, 932 So. 2d 883, 895 (Ala. 2005).  Such a duty does not mean that the party is required to "divulge all information that *may be* or *may become* relevant to the other party." *Id.*  Rather, a party is required only to "disclose those facts that are material to the ones already stated so as to make them truthful." *Id.*

Here, Appellant asserts that Appellees omitted material facts in making three representations.  First, Appellant alleges that Appellees' representations that "Uniti was a properly constituted REIT" were false and misleading because they relied on overinflated assumptions about the useful life of the copper network.  Appellant's Br. at 3, 8-10.  Appellant contends that if the useful life of the network were to wind down before the lease expired, Windstream's payments would constitute a financing arrangement (not a true lease) that in turn, would threaten Uniti's status as a REIT.  *Id.*

Second, Appellant alleges that Appellees' representations that "Uniti had a long-term $650 million per year lease with a 'stable' lessee" were false and misleading because Windstream Services was prohibited from entering into a sale and leaseback transaction.  Appellant's Br. at 3, 10-12.  It asserts that Appellees "were aware that the Master Lease violated the sale-leaseback bar, yet they chose to hide that fact from investors." *Id.* at 11.

Third, Appellant alleges that Appellees' representations that "Uniti would pay a regular and 'iron-clad' dividend from that income stream" were false and misleading

because in purportedly violating its sale-leaseback bar, millions and dollars of Windstream's outstanding notes could be deemed immediately due and payable. Appellant's Br. at 3, 12. If this were to occur, Appellant contends, Windstream would be unable to make its rental payments.

Although Appellant goes to great lengths to distinguish its claims from ones based on speculation or potential litigation risks, such attempts are futile. In essence, Appellant is arguing that Appellees should have disclosed the likelihood and possibility that legal action could upend the Master Lease and threaten Uniti's viability as a REIT. The District Court correctly concluded that these claims relied on inactionable omissions, and it thoroughly explained its rationale. Appellees had no duty to disclose the possibility that Uniti's status as a REIT and the Master Lease could be threatened by potential legal action, particularly when, at the time they made the alleged representations, they had no indication that any lawsuit was forthcoming. *See Ala. Psych. Servs.*, 81 So. 3d at 1247 ("the defendant had a duty to disclose an *existing* material fact") (emphasis added); *cf. Fincher v. Robinson Bros. Lincoln-Mercury, Inc.*, 583 So. 2d 256, 259 (Ala. 1991) ("'puffery' or predictions as to events to occur in the future are not statements concerning material facts upon which individuals have a right to act and, therefore, will not support a fraud claim").

However, even if we were to hold that such a duty existed, Appellant's claim would otherwise fail because Appellees made sufficient disclosures through the spinoff documents and Master Lease. Indeed, as Appellant concedes, "Uniti has always disclosed the risk that the Master Lease could be recharacterized as something other than

8

a 'true lease.'" JA88 ¶ 70. Uniti also warned that it "[could not] assure . . . [its] ability to pay dividends in the future," explaining its "ability to pay dividends may be adversely affected by a number of factors." JA975. It further warned that "[t]he inability or unwillingness of Windstream Holdings to meet its rent obligations under the Master Lease could materially adversely affect [its] business, financial position or results of operations, including [its] ability to pay dividends to [its] shareholders as required to maintain its status as a REIT." JA968. Additionally, the Indenture containing the leaseback transaction bar was publicly available.

### 2. By Misrepresentation

Pursuant to Alabama law, to successfully plead a fraudulent inducement by misrepresentation claim, a plaintiff must plead that the defendant made: "(1) [a] false representation (2) of a material existing fact (3) relied upon by the plaintiff (4) who was damaged as a proximate result of the misrepresentation." *Ala. Psych. Servs.*, 81 So. 3d at 1247 (citations omitted).

In this case, Appellant contends that Uniti's representation that it "had the necessary consents to purchase SLF's network" was false or misleading because Windstream was required "to but did not consent to the purchase of SLF, a competitor." Appellant's Br. at 3-4. This claim fails because Appellees did not make a misrepresentation. Under the terms of the Master Lease, Uniti was required only to obtain Windstream's consent for mergers and consolidations, not asset purchases like the SLF transaction.

9

**B.    Remaining Claims**

To prevail on a securities fraud claim under Sections 8-6-17 or 8-6-19 of the Alabama Securities Act, a plaintiff must plead either an "untrue statement of a material fact" or an omission.  Ala. Code § 8-6-17; Ala. Code § 8-6-19.  Because Appellant has failed to successfully plead an actionable omission or misrepresentation, its claims arising under the Alabama Securities Act and its civil conspiracy claim must also fail.  *See Triple J Cattle, Inc. v. Chambers*, 621 So.2d 1221, 1225 (Ala. 1993) ("[A] conspiracy claim must fail if the underlying act itself would not support an action.").  Similarly, Appellant's claim seeking a declaratory judgment, which was premised on purported misrepresentations and omissions in the Purchase Agreement, *see* JA139-41, likewise fails.

## IV.    CONCLUSION

For the foregoing reasons, we will affirm the District Court's order dismissing Appellant's state law claims.